**METZ v. GARVIN, Alien Property Custodian.**

(District Court, S. D. New York.   June 2, 1921.)

War ⚖⇒12—Evidence held to show German corporation's transfer of stock in New York corporation bona fide, entitling transferee to possession from Alien Property Custodian.

Evidence *held* to show that German corporation's transfer of stock in New York corporation to plaintiff, who was managing officer of New York corporation, in fact transferred title, and was not mere colorable device against attacks under Sherman Anti-Trust Law, and plaintiff was entitled to recover possession of stock from Alien Property Custodian under Act Oct. 6, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e.)

In Equity.   Suit by Herman A. Metz against Francis P. Garvin, as Alien Property Custodian and successor in office to A. Mitchell Palmer.   Decree for complainant.

O'Gorman, Battle & Vandiver, of New York City (Almuth C. Vandiver and Isaac H. Levy, both of New York City, of counsel), for complainant.

Francis G. Caffey, of New York City (William Travers Jerome, Joseph Sapinsky, and Harland B. Tibbetts, all of New York City, of counsel), for defendant.

MAYER, District Judge.   This is a suit in equity brought under section .9 of the Act of October 6, 1917, known as Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), to establish the title of plaintiff in and to 1,990 shares of the capital stock of Farbwerke-Hoechst Company, a New York corporation. The authorized and issued stock of the corporation is 2,000 shares of the par value of $100 each.   A certificate No. 22 for 1,990 shares of the stock was issued to A. Mitchell Palmer as Alien Property Custodian, and pursuant to the Custodian's demand was deposited with the Empire Trust Company on February 14, 1919.   On November 21, 1918, certificate No. 21 for 1,990 shares was canceled as precedent to the issue of No. 22, supra, the demand for said cancellation and for the issuance of a new certificate having been served on November 9,

1918.   Due proceedings were thereafter had as preliminary to this suit and while other points were originally advanced, the sole question now, as matter of fact and law, is that of ownership of the stock.

As a seizure or demand by the Alien Property Custodian is likely to carry the suggestion to those not informed in respect of the controversy that the demandee in some manner may have been improperly associated with the enemy, it is desirable at the outset to state that no such situation exists here, nor did counsel for the Alien Property Custodian so contend.   Indeed, the cause has been tried by counsel for both sides, in a most helpful way, with entire fairness and liberality, in order that the truth might be ascertained.   The transactions here concerned took place long before our entry into the war, and, indeed, before the European war started, and had no relation to either.   It is important, also, to note that this is one of those cases where the record does not fully picture the characteristics of manner and temperament of the principal actors, and these must be understood in order to arrive at a correct understanding of the essential facts.   If the transfer of stock and the note dated July 17, 1913, honestly represent the transaction between the parties, then the sole remaining question is the legal effect of the transaction, so far as it concerns the ownership of the stock in controversy.

The Alien Property Custodian contends that the transaction was colorable, and not in fact a transfer of title to Metz, but a device to safeguard against possible attacks under the so-called Sherman Anti-Trust Law, and that the parties understood that the stock was always the property of the German corporation hereinafter referred to. In order to understand the circumstances under which the note, supra, was executed, it is necessary to outline the history of the relations of the parties antecedent thereto.

Plaintiff was born in New York City. In 1882, he began as a boy in the dyestuff business with P. Schulze-Berger, then became laboratory assistant, then city salesman, then traveling salesman and supervisor, and then head of the office, with an interest in the profits.   This business was incorporated about 1902 as Victor Koechl & Co., and later plaintiff bought the entire capital stock, of $200,000 par value, for $300,000.   Thus in the course of about 20 years plaintiff, who presumably started with no means, became the owner of a valuable business.   Obviously this result must have been attained because of the ability and

driving qualities of Metz, and in this branch of business his name, consequently, was a trade asset. Thus it is that, under date of February 12, 1902, a contract was entered into between Farbwerke vorm Meister Lucius & Breuning, a German corporation (hereinafter, for brevity, so to be referred to), having its principal place of business at Hoechst, near Frankfort on the Main, as party of the first part, and Metz and Victor Koechl & Co. and Consolidated Color & Chemical Company (the last-named unimportant, except for technical routine) as the other parties. Prior to this agreement, the Koechl concern had the exclusive agency of the German corporation, but it also sold goods of other companies, Swiss, French, and English. It was plainly to the advantage of the German corporation to restrict Metz from engaging as agent or otherwise in a kindred or competitive business, and it was similarly to the advantage of Metz to hold the exclusive agency for the German corporation.

Naturally, if the name of Metz was used, the product of the German corporation would become associated in this country with that name. Hence this agreement was not one-sided, but reciprocal in its obligations and advantages. Consequently the agreement of 1902 provided for the formation of a corporation to be formed, to be known as H. A. Metz & Co., with 2,000 shares, of $100 each. It further provided for the immediate acquisition by the German corporation of 500 shares (a one-quarter interest); the right to buy a corresponding proportion of any increase of capital stock; the right to purchase, "should the said Metz die or for any reason withdraw from the active management," the remaining 1,500 shares for $250,000; the right, on the other hand, to Metz to purchase the stock of the German corporation before it could sell to any one else; the right to Metz of the exclusive sale of the German corporation's product on the one hand, and on the other restriction upon Metz's right to engage or to be interested in any business of a nature kindred to that of the company; a provision that Metz would not at any time sell his shares of stock or any part of them to any person or persons other than the German corporation; a deposit of all of the shares of stock, both Metz's and the German corporation's, in the Eastern Trust Company, to be withdrawn only on the joint order of the two; a similar right of purchase of the Metz stock in the event of Metz's insolvency, bankruptcy, or assignment for the benefit of creditors (see addendum). By further addendum at

the foot of the instrument, it is explained that the purchase price of the remaining 1,500 shares is fixed at $250,000; the reason being so that the total to be paid to Metz should reimburse him for the amount which he had paid to the former owners of Victor Koechl & Co., to wit, $300,000.

Under date of August 4, 1905, a further agreement was entered into between Metz et al. and the German corporation. This agreement provided, inter alia, that the name of H. A. Metz & Co. "will be changed" to Farbwerke-Hoechst Company at the time when the German corporation "may deem such change expedient and demand it." The agreement provides that Metz should continue as manager as theretofore until January, 1912, and further "provided that the Farbwerke do not in the meantime become the owner or acquire the control of the total capital stock of such three corporations, in which event the position of Metz, as manager, shall ipso facto cease." It also provided for the sale by Metz to the German corporation of 600 shares of stock, thus increasing the German holding to 1,100 out of 2,000 shares, or a majority.

Notwithstanding this, however, the parties continued the arrangement, which they had long adhered to, as to profits quite irrespective of stock ownership; i. e., one-half of the entire profit of the American corporation to Metz and one-half to the German corporation, and one-quarter to Metz of the profits which the German corporation might derive from their sales to the American corporation. The other features of this agreement of 1905 were substantially similar to those of 1902, and, except as modified, the 1902 agreement continued "in force unchanged."

Up to this time, and prior to 1912, the German corporation was not represented on the board of directors of H. A. Metz & Co., and Metz determined when the profits should be divided. In short, the business was conducted without any regard to the technical rights of stock ownership, and stock ownership was evidently solely an additional safeguard against the death or disassociation of Metz.

Under date of July 22, 1912, a third agreement was entered into. This agreement, provided, inter alia, that the name of the New York corporation should be changed from H. A. Metz & Co. to Farbwerke-Hoechst Company (hereinafter called the N. Y. Co.). It will be remembered that it had been agreed in 1905 that this should be done on the German corporation's demand, but approximately seven years had

passed without such demand. Meanwhile, salversan and novocaine, products of the German corporation, had become known throughout the world and were in great demand; also other German concerns were doing business here in their own name. This latter feature was a point of great irritation with Metz. It is plain that the German interests, now a majority owner of the stock and producers of these two important drugs, were not in the saddle. They did not wish to lose Metz, nor he them. The business was not only in these drugs, but as well in dyestuffs. Metz might lose the drug business, but he would be a power in the dyestuff field, either on his own account or in conjunction with others. Metz, on the other hand, as an able business man, did not intend that the German corporation's business should get away from him.

At this point the characteristics of Metz exhibited themselves. He is forceful, hasty, impetuous. He acts quickly and is impatient of detail. He has so long been accustomed to lead, and to be the principal and managing head, that he balks at playing the second hand. While, under the 1905 agreement, the name could be changed, the German corporation had no right, prior to his death or disconnection with the business, to acquire further stock. The following from Metz's testimony as to his talk in New York with Dr. Haeuser, the acting head of the German corporation, is therefore well illustrative of the situation:

"Q. Now, were any reasons stated by Dr. Haeuser as to why the German corporation wanted to acquire practically the entire stock of H. A. Metz & Co., and why they wanted to change its name? A. Yes, sir.

"Q. What were those reasons? A. Well, for instance, all of the other concerns had their own signs up here. They were doing everything under their own name. Salversan and novocaine were well-known products of Farbwerke, and inquiries were being made right along, asking where they could get these products. Physicians and dentists didn't know H. A. Metz & Co. I protested right along, and said that it was a mistake; they knew their name, but they said that they had their own name, and it made no difference. Well, I said that it made no difference, as long as I was alive, anyhow. The name was a big asset, particularly this name, and only in case I dropped dead; otherwise, there would be no change, everything would be the same. Why should they care whether it was turned over or not?

"Q. Were the two demands made together—that the name be changed and that they acquire the stock? Were those part of the same demand, those two demands? A. I think they were; I told them: 'If you do that, you might as well—why not buy the stock and be done with it—that I was not going to be a dummy in this thing.

"Q. If you did what? A. Changed the name.

"Q. You objected to them changing the name? A. Absolutely. I told them that it was a mistake.

"Q. And that there were lots of people who knew the firm of H. A. Metz & Co.? A. Yes, sir.

"Q. But you did see some advantage in changing the name, did you? A. Yes; but I refused to do it in 1902, to take my sign off, and it wasn't done up to this time.

"Q. Was that the thing that Dr. Haeuser was insistent about, that the name be changed? A. Yes.

"The Court: Did you have this talk with Dr. Haeuser in 1912? * * *

"The Witness: Yes, sir.

"Q. This contract of 1912 provides for the change in the name of H. A. Metz & Co. to the Farbwerke-Hoechst Company? A. Well, the previous contract provided that they could ask for it.

"Q. But this contract did provide that the change be made; is that right? A. Yes.

"Q. Now, when that was determined on, as a part of that, you said that the suggestion was made that they take all of your stock? A. Yes; I did. I said they might as well buy all of the stock then, and be through with it."

In addition, Metz was then being talked of in connection with a public office, and the German interests were "afraid" that he "would get into politics, and so they wanted everything in their own name."

Under the agreement of 1912, therefore, Metz sold to the German interests 890 shares, thus giving them 1,990 out of the total of 2,000 shares. Metz received the remaining $150,000, thus receiving $300,000, the price which he had paid for the corporation. Possession of the stock was changed from a control requiring joint action to the exclusive control of the German corporation.

H. A. Metz & Co. took over all the assets of Victor Koechl & Co., which was thereafter to be known as the "Pharmaceutical Department." Metz was to receive as compensation for his services 25 per cent. of the net profits of the Pharmaceutical De-

partment and 50 per cent. of the Dyestuff Department; the German corporation retaining 75 per cent. of the profits of the Pharmaceutical Department and 50 per cent. of the profits of the Dyestuff Department. Metz in addition was to receive 25 per cent. of the net profits, which the German corporation might make by virtue of its sales to the American corporation. Metz's 10 shares of stock were to bear no dividends.

Metz was given a power of attorney for two purposes—one "in order that it may be practicable to pay dividends and make distributions of the amount * * * as above provided, and to attend to the necessary details of the business of United States," and the other "to enable him to vote in its behalf at a special or annual meeting of stockholders of the said H. A. Metz & Co." Finally, this agreement was to supersede and to constitute a merger of all previous agreements between the parties in relation to the same subject.

Early in 1913, a suit was brought against the N. Y. Co. by one Dobson, of Philadelphia, under the Sherman Law, charging that, by reason of the cartel arrangement between the German dye concerns, the N. Y. Co. had violated the statute. In November, 1912, Metz had been elected a member of the House of Representatives. This suit naturally caused him great concern. He felt it was wholly unjust and never would have been started, if the business had remained as H. A. Metz & Co., instead of having been changed to a German name similar to that of the German corporation. He knew that in the mind of the trade and the public he was regarded as the owner of the business, and he felt that this suit would class him as a violator of the statute, and he insisted that the stock should be transferred back to him.

It is at this point that the litigants part in their construction of the transactions; plaintiff on his oath insisting that the transactions were real, and defendant reasoning that they were colorable. Dr. Haeuser is described by defendant's counsel (one of whom examined him on direct under an open commission in Germany) "as a lawyer and a man of affairs, * * * shrewd, keen-minded, and alert," Metz has already been described to some extent, but defendant's counsel add: "His statements are often inaccurate, not due to any intention to be other than truthful, but to a propensity to see facts as he wishes to see them, and an impatience against the tedium of being painstaking and careful."

Frederick W. Hinrichs is a respected member of the New York bar of many years' standing, a lawyer of scrupulous integrity, careful and painstaking in the highest degree. For many years, Hinrichs had represented the German corporation and Metz as well. It was a difficult task. He sought to point out clearly their respective rights, and to carry out their views so far as they were in accord, and to make plain the legal import and effect of the various transactions between them. Two strong men were now contending for position, Haeuser and Metz. The relations for years had been those of mutual confidence. The differences were due to conflicting views of business policy. Metz now attributes the Dobson suit and his own discomfort to the insistence of Haeuser and the German interests upon the change of name, and Metz now undoubtedly saw the opportunity under the pressure of the Sherman Law situated to regain the stock.

Some letters have not been found. To this no significance need be attached. In the war occupation of parts of Germany, it would not be strange if papers were lost or mislaid, and this is not the only case where some papers may have been lost which were turned over to the Alien Property Custodian, a not unnatural consequence of having to do with a great mass of documents. Whether these lost letters were so turned over or not it is impossible to state, but there can be no doubt that Metz turned over or placed at the disposal of the Alien Property Custodian all he had.

It must be remembered that all the communications inter Metz and the German interests and Hinrichs and the German interests were by correspondence. Nothing between the German interests and Metz was the result of personal interview. It appears from the letter of Haeuser to Metz dated April 12, 1913, that Metz had been advised, probably by cable, that the German corporation wished to transfer the stock to Speyer & Co., but Metz could "see no solution" in that procedure.

On April 22, 1913, Haeuser acknowledged receipt of Metz's letter of April 11, 1913, with inclosures. The inclosure apparently was a blank form of transfer to Metz upon which he had written: "This is to be here, ready for emergency, if prompt transfer be deemed advisable. Will not use it otherwise."

Undoubtedly Metz wished the transfer to be complete before the Dobson suit reached its climax. As yet it was pending, not having been settled until April 19, 1913; i.

e., after Metz sent his letter of April 11th. While the language as to "emergency," standing by itself, might look suspicious, it is well accounted for by the fact that the transaction was not yet closed, and that Metz wished to have the paper, or one similar in form, signed promptly and returned, thus saving the time which the mail would take each way.

Further, if the transaction was colorable, why should Metz object to the deposit of the shares with Speyer & Co.? If Metz was to acquire nothing, and the stock was to remain the property of the German corporation, why not let the German corporation handle the stock in its own way? Possibly, at this time, the German interests may have construed the situation as one designed solely to meet the Dobson and similar situations; but, if so, they were soon disillusioned. They certainly did not enjoy the Sherman Law attack, and it soon became plain to them that Metz was insistent and in earnest. If Metz quit, they would lose his services as a successful and resourceful seller of their goods, as well as his aid in dealing with the Sherman Law situation, and at a critical time it would have been necessary for them to make a new business connection. From April, 1913, until July 17, 1913, there was much correspondence around the circle, too long to set forth in detail. Hinrichs was endeavoring to keep the situation correct in its legal details. Metz was writing, sometimes with Hinrichs' knowledge, sometimes not. Metz was taking Hinrichs' advice in some respects, and disregarding it in others. In short, unless the court is willing to stigmatize Metz as untruthful, the negotiations were genuinely spirited and at arm's length. Good repute in a community, gained after many years, must count much. That Metz should deliberately by his testimony falsify the true transaction is not to be thought of. That Hinrichs was, as is suggested, so blind that he was an unconscious tool in the hands of the German corporation and Metz, denies the intelligence of an exceedingly careful lawyer. Indeed, it was this care which, more than once, provoked Metz's impatience; but it is this very care which now pictures the negotiations in their true aspect. It was Metz's chance to come into what he felt was his own, the business which he had built up, partly through the merit of the goods, but largely through his ceaseless energy and commanding business ability, and he pressed his opportunity to the utmost.

The transaction was finally carried out in Montreal, Canada, for various technical rea-sons, fully explained by Hinrichs. It had been preceded by the letter of Haeuser, dated May 8, 1913, as follows:

"Farbwerke vorm. Meister, Lucius & Bruning, Hoechst am Main. Hoechst a/M, May 8, 1913. My Dear Mr. Metz: In accordance with your urgent wish we declare ourselves ready to sell you the 1,990 shares of Farbwerke Hoechst stock which we purchased some time past, but only under the following conditions:

"(1) The purchasing price is $300 for each share; the total, therefore, is $597,000.

"(2) We are ready to give you credit for this purchasing price against your promissory note, payable on demand. Furthermore, for our security, these shares must be deposited to our sole disposition in Montreal, or in another place to be determined by us, in a bank to be determined by us.

"(3) You pledge yourself to return the shares to us for the same price for which we sell them to you to-day, in case you cease to be president of the Farbwerke Hoechst Co., on account of death, or any other cause. As security for this condition of the retransfer, you will already now attest on the certificates the retransfer specification, which is to be canceled again if we should forego our right of repurchasing, as in the case described above.

"I beg you to carry out in legal form the preceding conditions with the concurrence of Mr. F. Hinrichs, to whom I am sending a copy of this letter. Inclosed we send you power of attorney to receive the certificates at the Trust Company; also our declaration concerning the transfer of our stock of the Farbwerke Hoechst Co.,

"With friendly greetings,

"Yours truly, Dr. Haeuser.

"At the Bank of Montreal or the Royal Bank of Canada."

But when the transfer took place and the note came to be executed the latter read as follows:

"New York, July 17, 1913.

"$597,000.

"On demand, for value received, I promise to pay to the German corporation of Farbwerke vorm. Meister, Lucius & Bruning, Hoechst a/Main, Germany, at the office of Farbwerke-Hoechst Company, in the city of New York (should there be no office or should the same be closed at the time of the attempted demand, such demand in that case is hereby expressly waived), five hundred and ninety-seven thousand dollars ($597,000) in lawful money of the United States, having deposited with said corporation as collateral security for the payment of

this note, the following property, on the conditions herein specified, to wit, nineteen hundred and ninety (1,990) shares of the capital stock of the Farbwerke-Hoechst Company, a New York corporation, the value of which is now five hundred and ninety-seven thousand dollars ($597,000).

"The undersigned hereby gives the said German corporation a lien for this note, upon said stock, and does hereby authorize said corporation after the nonpayment of this note or any part thereof, to sell the whole or any part of said collateral security, upon which said corporation is hereby given a lien, at any broker's board or at public or private sale, at the option of the said corporation, without demand or notice of intention to sell or of the time or place of sale (such demand and notice being hereby expressly waived)—to apply the proceeds to pay this note, and does hereby agree that at any such sale the said corporation may be a bidder and become a purchaser of any or all of said collateral security, and may hold the same thereafter in its own right absolutely, free from any claim of the undersigned, and does hereby agree that said corporation may transfer this note, and that upon such transfer said corporation may deliver all security held therefor, or any part thereof, to the transferee who shall thereupon become vested with all the powers and rights herein given to said corporation in respect thereto, and said corporation shall thereafter be forever relieved and fully discharged from any liability or responsibility in the matter.

"It is further agreed that if the undersigned shall become insolvent or make a general assignment for the benefit of creditors, or file a petition in bankruptcy, or if a petition in bankruptcy shall be filed against him or a receiver shall be appointed of his property or assets, then this note shall become thereupon due and payable forthwith.

"It is further agreed that no delay on the part of the holder hereof in exercising any rights hereunder shall operate as a waiver of said rights.        Herman A. Metz."

The transaction is fully reported in the letter of Hinrichs to the German corporation, dated July 21, 1913. There are inaccuracies in the testimony of Metz, given after hasty response to a call of the representative of the Alien Property Custodian, but appreciating the characteristics of Metz as described by counsel for the defendant and by the court, an unfavorable significance need not be attached to these inaccuracies; and the same may be observed of an occa-

sional expression in his letters, because the satisfying test of correspondence is to consider it as a whole in relation to the subject-matter, rather than to overemphasize phrases detached from the context.

I am satisfied, on the whole case, that the transaction was genuine, and that the transfer of the stock was real, and not colorable. Having arrived at this conclusion of fact, Metz as matter of law is the owner of the stock. Hiscock v. Varick Bank of New York, 206 U. S. 37, 27 S. Ct. 681, 51 L. Ed. 945; Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Wilson v. Little, 2 N. Y. 443, 51 Am. Dec. 307.

It is urged, however, that the limitations placed by Haeuser in his letter of May 8, 1913, constitute the agreement between the parties; that the papers of July 17, 1913, were not intended to constitute a contract, but were instruments of execution delivered in attempted performance of what was pretended to be a previous contract; and therefore that the German corporation reserved to itself "such possessory rights and incidents of ownership as to come" within section 7 of the Trading with the Enemy Act (section 3115½d).

On July 17, 1913, however, Hinrichs was representing the German corporation as well as Metz. If the transaction was colorable, this letter, though written in good faith, was of no consequence as describing the legal rights of the parties. But, as the transaction was genuine, it would be expected that the German corporation would protest or indicate its disapproval, if it considered that failure to carry out any of the conditions of Haeuser's letter of May 8, 1913, was such a violation of the understanding between the parties as vitiated the Montreal transaction. Hinrichs had written:

"The sale to Mr. Metz of 1,990 shares is completed, with the exception of the final entry in the stockbook kept at Esopus, in Ulster county. We are sending for that book now, in order to make the requisite entries.

"Such letter also informs you that the signing and delivery of the demand note and the giving of the security for its payment have been completed. The status of the 1,990 shares of stock is, therefore, that the title is complete in Mr. Metz, subject to your lien.

"No formal demand is ordinarily required in the case of demand note, in order to entitle the holder to sue or to avail himself of his security. But we have thought it only

fair and in accordance with your desires that some protection should be given to Mr. Metz, in the form of a demand as a preliminary to the sale of the security or to the bringing of an action against him. We have, therefore, provided for a demand, but it is a demand which can be easily made here in New York. As to the sale of the security, you will observe that notice, etc., of such sale are waived. There are some provisions in the note which were not legally necessary, but we adopted them largely to satisfy Mr. Metz, who wished to have the note conform, so far as possible, to a printed form of demand note which has gradually grown up to be customary with some of our large banks here.

"We trust that you will approve of all that we have done as to the note and as to the security, and as to going to Montreal, and the like."

When Haeuser was examined in Germany, he testified:

"Q. Now, referring specifically to your German letters of May 8th and July 11th, respectively, and the paragraphs to which I have called your attention, they embodied the same condition to this transaction with Mr. Metz, did they not? A. They contain the same condition.

"Q. You have never at any time told Mr. Metz this condition was withdrawn, or changed, or modified in any respect? A. As far as I remember this condition has not been fulfilled by Mr. Metz, and we have not insisted upon it.

"Q. Have you gotten a letter since July 11, 1913, from Mr. Metz in answer to your letter of July 11, 1913? A. I do not remember.

"Q. Have you had a letter from Mr. Hinrichs concerning this condition which you mentioned in your letter of July 11, 1913? A. I do not remember.

"Q. You say you had no personal talk with Mr. Metz or any one else concerning this transaction since the spring and summer 1913, have you? A. Yes.

"Q. You mean by your answer you have had no personal talk with Mr. Metz or any one else since May, June, July, 1913? A. Since the delivery of the promissory note I had no personal communication with Mr. Metz or any one else on the subject, nor any one else representing him.

"Q. So far as you know, there was no written objection by Mr. Metz to this condition, embodied in the letter of July 11, 1913, in paragraph 2, marked 'Exhibit 5'? A. I saw the opposition of Mr. Metz in the fact that he did not fulfill the condition.

"Q. That does not answer my question. I object to it as irresponsive. When you say 'he did not fulfill the condition,' do you mean the promissory note you received did not have this condition embodied in it? A. As far as I recollect, the promissory note did not contain such condition.

"Q. And is that your only reason for saying that Mr. Metz did not fulfill the condition? A. As far as I remember, we ourselves did not come back on this condition, as we did not consider it of substantial importance. * * * Out of the letter of Mr. Metz and his testimony, I have the impression that Mr. Metz was willing to fulfill the condition, but that he believed the collateral note was sufficient security, and we came independently of Mr. Metz to the same opinion.

"Q. See if this is a fair statement of what you endeavored to say, viz.: It was a condition that you exacted that in the event of the death of Mr. Metz, or his resignation from the company, or his getting out of the company, your company should get back the stock for the same consideration which Metz was to pay; that Metz also was willing, in the event of his death, or his getting out of the company, that you should get back the stock for the same consideration that he paid. The papers, as finally delivered, insured this condition to you, and from reading Mr. Metz's testimony and letter of July 1, 1913, you were under the impression that the papers as delivered secured this condition to you? A. This status does not quite correspond with my conception. * * * According to my opinion Mr. Metz did not fulfill the condition. We considered it sufficiently insured by the obligation which sprang out of the collateral note, and we were aware of the fact that we would lose our right out of the promissory note in case that Mr. Metz or his heirs were willing to pay the note.

"Q. Dr. Haeuser, you were being advised as to the legal effect of this transaction by Mr. Hinrichs? A. Yes.

"Q. Did you ever receive any opinion, either oral or written, from Mr. Hinrichs, as to the effect of the delivery of that promissory note, together with the collateral when taken in connection with your letter of May 8 and July 11, 1913? A. He did not communicate with us anything orally. In writing, he only expressed, as far as I remember, the opinion that we were not sufficiently insured by the mere delivery of the promissory note. * * *

"Q. It was your wish throughout, was it not, to insure to your company, if it could

be insured, this condition that in the event of Mr. Metz's death or his withdrawal from the company your company should get back the stock at whatever Metz had paid for it? A. Yes; that was my wish.

"Q. And from the time that you expressed that wish in these letters of May 8 and July 11, 1913, did you receive any communication, either written or oral, from Mr. Metz or from Mr. Hinrichs, stating that Mr. Metz would not agree to that condition? A. I do not remember. In any event, he did not fulfill the condition.

"Q. Your sole reason for saying that he did not fulfill the condition, is it not, is that the promissory note and the collateral did not embody this condition? A. The reason I say that Mr. Metz has not fulfilled the condition is that there is no agreement existing between Mr. Metz and our company through which this condition was fixed.

"Q. That is your only reason for saying that? A. I know the condition was not fulfilled.

"Q. Was your reason for saying that there was no such agreement the fact that it was not embodied in the promissory note and the papers that were finally delivered? A. This is not the reason. The reason was the fact that Mr. Metz did not want to enter into obligations outside of the promissory note.

"Q. Do you mean that Mr. Metz did not want to enter into any obligation outside of the promissory note, or that he did not want to put that obligation in writing? A. I believe that he was not willing to take any other obligation, orally or in writing, aside from the promissory note."

This was reiterated several times in one form or another. Further he testified:

"Q. Did you or did you not accept this note and the transfer of the stock as collateral security for the payment of the note as the complete and entire obligation of Mr. Metz? A. I did.

"Q. Did you understand that, in case you demanded payment and Mr. Metz failed to pay, you could sue him in an action at law? A. I did.

"Q. And did you understand that if there was a deficiency that Mr. Metz personally would be liable under that note? A. I did.

"Q. And did you understand that his estate would also be liable in case of deficiency? A. Yes.

"Q. And did you understand, in case you demanded payment for the note and it was not paid, you could sell the collateral to a third person? A. Yes; I understand.

"Q. Now, I call your attention to another paragraph of the letter of July 21, 1913, from Mr. Hinrichs to your company, in which it is stated as follows: 'In the present status of matters by which Mr. Metz has become the sole owner of such stock subject to your lien, as expressed in the demand note'—and ask you whether it was your understanding that, by the making of the note and the delivery of the stock to Mr. Metz, he became the sole owner of the stock of the American Company? A. Yes.

"Q. And did you understand that your sole right consisted of a lien, as expressed in the demand note? A. Yes.

"Q. Did you rely upon the advice you received from your attorney in this letter of July 21, 1913? A. Yes.

"Q. Did you fully understand that your rights and the obligations of Mr. Metz were such as are set forth in that letter? A. Yes.

"Q. Did you, at any time after the note and collateral were delivered to the bank at Montreal, ask Mr. Metz, or request him, or suggest to him, that he should make any other or additional agreements with reference to this transaction? A. No; I did not.

"Q. Did you, at any time after the delivery of the note and the collateral, request him or direct your attorney in New York to procure any further or additional agreement with Metz in reference to this transaction? A. No; I did not.

"Q. With reference to the right of the company to acquire the stock in case Mr. Metz died, or in case his connection with the American Company terminated, what was your original desire, as expressed in your letters? A. To reacquire the shares.

"Q. Now, in the beginning, that was one of the conditions laid down by you as to the transaction. Is it not? A. Yes; it is.

"Q. Now, finally, when the note and the stock were delivered, was it your understanding that the condition laid down by you in the beginning had not been complied with? A. In my opinion the condition was not fulfilled."

Redirect examination by Mr. Sapinsky:

"Q. Dr. Haeuser, you have never before July 17, 1913, or after July 17, 1913, communicated your understanding of what you wanted embodied in that contract to Mr. Hinrichs or any one else, who had part in the transaction, other than by written communications? A. No; I have not.

"Q. And Mr. Metz, on the other hand, has not, either in person or through anybody else, communicated to you his understanding whether he wished other than by

written communications? A. No; he has not.

"Q. So any communications from mind to mind from you to Mr. Metz or Mr. Metz to you were embodied in letters or in writings? A. Yes.

"Q. You knew that Mr. Hinrichs was permitting Metz to either read the letters you wrote to him or was supplying him with copies? A. I know that Mr. Hinrichs was showing the correspondence to Metz, but I never expressly authorized him to do so."

From July, 1913, until Germany declared war against Russia on August 1, 1914, to go no further, not a word of protest came from the German interests. They might well have supposed that, if Metz contemplated at any time not to continue to sell their goods and not to keep up his friendly business relations with them, the amount of the demand note would cause him to pause. Besides, owing to the previous methods of business between Metz and the German corporation, the stock ownership would not affect the apportionment of profits nor future business relations, as is, in effect suggested in the Hinrichs letter of July 21, 1913, in the paragraph beginning, "Now, as to what is still to be done, if anything." But, whatever may have been their viewpoint, this testimony of Hauser can only be rejected on the theory that both Haeuser and Metz have willfully deceived the court by false testimony.

Disregarding, then, the "conditions" so called, and looking to the transfer and the note, there is no obstruction to the title of Metz to the stock in question.

Plaintiff may have a decree in accordance herewith.