**MAGG v. MILLER, Alien Property Custodian, et al.**

(Court of Appeals of District of Columbia. Submitted February 5, 1924. Decided March 3, 1924.)

No. 4007.

1. War ⬗12—Evidence held to show transfer of stock to Swiss citizen was bona fide.

In an action to recover stock in an American corporation seized by the Alien Property Custodian evidence *held* to show that a transfer of the stock by a German citizen to a Swiss citizen on February 22, 1917, was a bona fide business transaction.

2. War ⬗12—Property not subject to seizure, because transferred when war imminent.

Shares of stock in an American corporation are not subject to seizure under Trading with the Enemy Act, § 7b (Comp. St. 1918, Comp. St. Ann.

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Supp. 1919, § 3115½d). because a transfer thereof by a German citizen to a Swiss citizen was made within enemy territory after diplomatic relations had been terminated and when war was imminent, where title passed before the declaration of war.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by Joseph Magg against Thomas W. Miller, as Alien Property Custodian, and Frank White, Treasurer of the United States. From a decree dismissing the bill, complainant appeals. Reversed and remanded for further proceedings.

William A. Redding and Ambrose L. O'Shea, both of New York City, and Charles S. Grindle, of Washington, D. C., for appellant.

Peyton Gordon, Dean H. Stanley, and C. W. McClean, all of Washington, D. C., and Frederick G. Ingersoll, of St. Paul, Minn., for appellees.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. This appeal is from a decree of the Supreme Court of the District of Columbia, dismissing the bill of appellant, Magg, in an action against the Alien Property Custodian and the Treasurer of the United States to recover certain stock seized and held by them.

[1] It appears that Magg has resided in Switzerland for more than 52 years, excepting 1½ years' residence in Paris, and that he became a citizen of Switzerland, April 27, 1899. On April 10, 1915, one Georg Wustenfeld, a citizen of Germany, purchased 850 shares of the capital stock of the Bearings Company of America, evidenced by stock certificate No. 128. The certificate was delivered to a company of New York brokers and held by them until the shares were sold by Wustenfeld to Magg on February 22, 1917. During the period between the purchase and sale of the stock, Wustenfeld received the dividends thereon at the rate of about 2½ per cent. per month. The sale of the stock from Wustenfeld to Magg is evidenced by the following written agreement:

"Senator Georg Wustenfeld, Hanover, Munden, is the owner of 850 shares at a nominal value of $100 each of the Bearings Company of America, Lancaster, Pa., U. S. A., which shares are at this time deposited with the New York banking firm of Knauth, Nachod & Kuhne, New York. By these presents Mr. Wustenfeld sells these shares to Mr. Joseph Magg, Zurich, Wiesenstrasse 17, at a total price of 200,000 dollars (two hundred thousand dol.).

"Mr. Wustenfeld cedes at the same time explicitly his rights to have these shares handed over by Messrs. Knauth, Nachod & Kuhne to Mr. Magg.

"10,000 marks of the sale price were paid in cash, the remainder will be paid by counter-payment.

"This contract was made in double and one copy was handed to each of the signing parties.

"Schweinfurt, /m., February 22, 1917.

"[Signed]                Senator Georg Wustenfeld.
                            "Joseph Magg."

This contract was duly witnessed by a counselor of justice and certified to by a notary public. The consideration, $200,000, was fixed

on the basis of the normal exchange of the German mark, or 4⅕ marks to the dollar. In other words, the consideration to be paid by Magg for the 850 shares of stock was $200,000, represented by 840,000 marks. Of this consideration Magg paid Wustenfeld, on the signing of the contract, 10,000 marks, leaving a balance due of 830,000 marks. This was paid as follows: Magg secured from one Ernst Sachs an assignment to Wustenfeld of four-fifths interest in the copartnership known as F. Gottschalk & Co., valued at 830,000 marks. This assignment was executed and delivered to Wustenfeld on February 23, 1917.

It, however, appears that Sachs did not own a four-fifths interest in the firm of Gottschalk & Co., but only a two-fifths interest; one-fifth interest, prior to the transaction, was owned by Wustenfeld, and the remaining two-fifths interest was owned by one Hedwig Ficktel, who was the widow of the deceased partner of Sachs. However, Sachs obtained an assignment to Wustenfeld of the two-fifths interest belonging to Mrs. Ficktel, and thereby was enabled to carry out the transaction. Thus Wustenfeld was paid the full consideration for his stock.

This brings us to the relations existing between Sachs and Magg, upon which the motion for dismissal of the bill in the court below seems to have been based. Magg was the brother-in-law of Ernst Sachs, Sachs having married Magg's sister. Sachs was indebted to Magg, and in an account stated between them February 23, 1917, it appeared that this indebtedness amounted to 746,000 marks, which was offset against Magg's indebtedness to Sachs of 830,000 marks, growing out of the Wustenfeld transaction. The difference of 84,000 marks, Magg paid as follows: 10,000 marks in cash; 4,000 marks allowed Magg for expenses; 80,000 marks transferred by Magg from Switzerland to the Deutsche Bank in Berlin, where it was placed to the credit of Sachs. It thus appears that Magg paid as consideration for the Bearings Company stock 94,000 marks, of a normal exchange value of $22,372, and in addition canceled a debt which he held against Sachs amounting to 746,000 marks, of a normal exchange value of $177,542.

The indebtedness of Sachs to Magg grew out of a transaction covering a long period of years. It appears that Magg advanced money for a period of over 40 years to the parents of Ernst Sachs, Josef and Pauline Sachs, which Ernst obligated himself by written and verbal promises to pay. These transactions culminated in a settlement between Magg and Ernst Sachs on July 15, 1914, as follows:

"Contract between Mr. Josef Magg, of Zurich, Wiesenstrasse 17, and Commercial Counselor Ernst Sachs, of Schweinfurt on Main, the following contract has been agreed upon this day:

"Sec. 1. Whereas, Mr. Josef Magg has a claim for money lent against Mr. and Mrs. Josef and Pauline Sachs, formerly of Constance, which amounts up to date, inclusive interest, to Mk. 660,000 (six hundred and sixty thousand marks).

"Sec. 2. Mr. Josef Sachs died, and left his widow, Mrs. Pauline Sachs, as heir; consequently the claim of Mr. Josef Magg has been transferred upon the former.

"Sec. 3. Already during the lifetime of Mr. Sachs' father, Mr. Ernst Sachs, commercial counselor, promised the former repeatedly that he would take over

the debt of his parents, if ever he should be in a position to do so, and pay back Mr. Josef Magg.

"Sec. 4. Since Commercial Counselor Ernst Sachs is now in a position to live up to the promise given to his parents, he has taken over said debt as sole debtor and obliges himself to discharge his parents, respectively his mother, who is still living, and to pay back the money owed to Mr. Josef Magg, who recognizes as sole debtor Mr. Ernst Sachs, discharging thereby the latter's parents.

"Sec. 5. Mr. Magg agrees to let the debt remain until further notice upon payment of a yearly interest of 5% (five per cent.) on the condition that six months' notice is to be given for the repayment.

"Schweinfurt on Main, July 15, 1914. ·                                    Ernst Sachs,
                                                            "Joseph Magg."

There is ample evidence in the record showing the advancement of money by Magg to the parents of Ernst Sachs, to support the validity of the above settlement. On the other hand, no evidence was adduced whatever to challenge the bona fides of this settlement between Magg and Sachs. The settlement was made before the beginning of the World War. It was made when no one even contemplated that the United States would be at war with Germany, or that there would be any possibility of the confiscation by the United States of the Bearings Company stock, or that Magg would three years hence become a purchaser of the stock in question.

We think this settlement lies at the basis of this case. There is a total absence of proof challenging the direct testimony of the parties to the effect that it was made upon the date which it bears. The settlement occurred at a time when there could have been no motive whatever for anticipating the future events which have transpired, culminating in the seizure of the stock in question by the United States. Time and again Ernst Sachs, in written communications appearing in the record, acknowledged his liability for the debt due from his parents to Magg. In the accounting made between the parties, as shown by the contract of July 15, 1914, 660,000 marks were found to be due Magg, which Sachs obligated himself to pay, with interest at 5 per cent. per annum, when called upon by Magg to make payment.

The contract of July 15, 1914, was a valid and enforceable contract in Germany, as testified to by Gustav Wirth, a distinguished German lawyer. This witness, after having the facts presented to him upon which the agreement of July 15, 1914, were based, was asked:

"Is such a contract as Plaintiff's Exhibit 13 a legal and enforceable contract under the German law?"

To which he replied:

"This question must be answered in the affirmative. The contract of July 15, 1914, represents the taking over of a debt according to sections 414 and 415 of the German Civil Code. The manner in which it is drawn up shows that it has been drawn up by a lawyer, for it repeats in part the words of the German law."

The witness was further questioned:

"Could Ernst Sachs, in your opinion, successfully defend against a suit brought against him by Josef Magg in the German courts under the said contract, Plaintiff's Exhibit 13, on the ground that the claim therein asserted is outlawed or prescribed by the German law, or on the ground that there was nothing of value passing to him, Ernst Sachs, for his promise to pay as expressed in Plaintiff's Exhibit 13?"

To which the witness replied:

"None of these two foundations would enable Ernst Sachs to obtain the dismissal of such a suit on the part of the German courts."

On cross-examination the witness was asked:

"Assume that in 1880, at the time of the proceedings referred to in Exhibits 18 and 19, that Joseph Magg received notice of those proceedings, and that at that time or immediately thereafter he waived his claim against Joseph Sachs, testifying that thereby he did him (Sachs) a great service. Would that make any difference in your answer to question No. 15?"

To which the witness replied:

"This goes without saying. In that case the claim would be extinguished. It must, however, be taken into consideration that according to the German law the waiving is not a one-sided declaration, but a contract. The declaration of the waiving must be accepted by the debtor."

On a redirect examination the witness was asked:

"Would the fact that Joseph Magg stated to Joseph Sachs, at or about the time of the dates of Plaintiff's Exhibits 18 and 19, that he would not press his claims against him, Joseph Sachs, at that time, act as a waiver of his, Magg's, claim against Joseph Sachs?"

To which he replied:

"Such a declaration would not be considered by the German law as a waiver; it would merely be considered either as a postponement or a judicially not in the least binding courtesy."

On the matter of the running of the statute of limitations, the witness was asked:

"Am I correct in understanding, then, that it is your opinion, which opinion is based on section 222, par. 2, of the German Civil Code, that if, after the expiration of the 30-year limitation, the debtor acknowledges in writing his old debt to his creditor and promises to pay it, that in such event, on a subsequent suit in the German courts, based on the new promise, the debtor could not successfully defend such suit before the German courts by raising the defense of the 30-year limitation?"

To which he replied:

"Your assumption is correct."

The evidence is indefinite as to whether in fact the waiver was accepted by either Joseph Sachs, Pauline Sachs, or Ernst Sachs. By the agreement Ernst Sachs acknowledged himself indebted to Magg in the sum of 660,000 marks. It amounted to a composition of all differences between the parties to that date, resulting in a valid contract according to the laws of the country where it was made. It is an enforceable German contract, entered into between these parties prior to the entrance of Germany into the World War. The contract is based upon a valid consideration, which, under the German law, could not be questioned. All questions of waiver or limitations, as affecting the consideration, were foreclosed by the written agreement. It is doubtful, therefore, if a mere common-law trustee, after these years, can be heard in a foreign jurisdiction to challenge the sufficiency of the consideration which brought these parties into a lawful agreement.

This brings us to the question of the bona fides of the contract of February 22, 1917, by which Magg claims to have purchased from Wustenfeld the stock in question. On its face we have an executed contract, a sale in præsenti, containing language indicative of the intention of the parties:

"Wustenfeld sells" and "Wustenfeld cedes at the same time explicitly his rights to the shares handed over by Messrs. Knauth, Nachod & Kuhne to Magg."

The express intent on the part of the vendor to part with his right, title, and interest in the stock is clearly indicated from the tenor of Wustenfeld's assignment of the stock to Sachs, as follows:

"I have sold to Mr. Joseph Magg of Zurich, Wiesenstrasse, on February 22d of this year, 850 shares at 100 dollars each of the Bearings Company of America."

The contract on its face is without condition, and this is supported by the testimony of Wustenfeld, Sachs, and Magg, the ones to whose testimony we must look to determine the bona fides of this transaction.

Wustenfeld testified that there was not on February 22, 1917, or at any time since, any understanding, secret or otherwise, respecting the stock, either with Magg or Sachs, or any other person, other than shown by the written contract, and that at no time since that date has he claimed any right, title, or interest in the stock.

Magg testified that at no time did he make any agreements, other than that appearing in the contract, with either Wustenfeld or Sachs, or any other person, in regard to the stock in question; that he had no understanding or agreement, secret or otherwise, with any one in respect of said stock; and that, at all times since the making of said contract, he has claimed and still claims to be the true and sole owner, in his own right, of the whole right, title, and interest in and to said stock.

Sachs testified as follows:

"Q. 57. Did you on February 22, 1917, or at any other time, make any agreement, either in writing or by word of mouth, other than the agreements and documents to which you have testified in this cause, with either Joseph Magg or Georg Wustenfeld, or with any other person, with regard to any or all of the 850 shares of the Bearings Company of America here in suit? A. 57. No.

"Q. 58. Do you today claim any right, title, or interest in or to any of the 850 shares of the capital stock of the Bearings Company of America here in suit? A. 58. No."

It may be here suggested that, if Sachs and Magg were in collusion to defeat future seizure by the Alien Property Custodian, it would seem that all the stock held by Sachs would have been turned over to Magg. It, however, appears that 50 shares of the Bearings Company stock, valued at from $8,000 to $10,000, belonging to Sachs, were seized by the Alien Property Custodian, and are now held by authority of the Trading with the Enemy Act. This of itself has strong bearing upon the bona fides, not only of the settlement of July 15, 1914, but also of the final contract with Wustenfeld, by which the stock in question was transferred to Magg.

Immediate steps were taken to transfer the stock on the books of the company from Wustenfeld to Magg. While Magg, as the equitable owner of the stock, might have compelled its delivery and transfer on the books of the company (Ryan v. Martin [C. C.] 165 Fed. 765), Wustenfeld discharged his full obligation by notifying the Bearings Company of the sale of the stock to Magg. On February 27, 1917, Wustenfeld cabled the president of the Bearings Company as follows:

"Have sold my 850 shares of your company to Joseph Magg, Zurich, Weisenstrasse 17,"

Thus, so far as this record discloses, there was a complete executed contract for the sale of this stock, made at a period before the United States entered the war. It bears all the earmarks of a genuine business transaction, prompted by proper commercial motives, and of mutual advantage to the contracting parties. To impeach the contract the court must indulge in suspicion, not based upon, or even inferable from, any testimony in the case. In other words, we are asked to discredit the numerous witnesses who have testified to the bona fides of this transaction, without any evidence challenging the truth of their testimony.

[2] But it is urged that, inasmuch as the diplomatic relations between Germany and the United States had been terminated by the latter government prior to the date of the contract under which Magg claims title to the stock in question, the contract was made within enemy territory when war was imminent, and should be held to have been made for the purpose of avoiding capture. As was said in Stohr v. Wallace (D. C.) 269 Fed. 827, 841:

"A serious argument might be made in favor of such a result, once a policy of land capture be inaugurated; but under this act [the Trading with the Enemy Act] it appears to me that section 7b [40 Stat. 416] effectively closes any such discussion. A part of the first paragraph of that section reads as follows: 'No person shall by virtue of any assignment * * * to him of any * * * chose in action by * * * an enemy * * * have any right or remedy against the * * * obligor * * * unless said assignment * * * was made prior to the beginning of the war.' It might, indeed, be open to a good deal of question whether this included an assignment of equitable interests in shares of stock (Brown v. Fletcher, 235 U. S. 589, 35 Sup. Ct. 154, 59 L. Ed. 374), though shares are analogous to choses in action (Jellenik v. Huron Copper Co., 177 U. S. 1, 20 Sup. Ct. 559, 44 L. Ed. 647), and a fortiori equitable interests in shares. But I think that the purpose of the statute is pretty clearly indicated, even if its letter do not cover this precise case. It can scarcely be supposed that an exception would be made in favor of ante bellum transfers of choses in action which did not apply to property so nearly akin as this, or indeed to all property, and it is clear that absolute transfers of choses in action before April 6, 1917, would be valid."

This case was affirmed in Stoehr v. Wallace, 255 U. S. 239, 41 Sup. Ct. 293, 65 L. Ed. 604.

In the present case, not only the equitable but the legal title to the stock had passed to Magg before the actual declaration of war on April 4, 1917; hence the stock under the provisions of section 7b of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), was not subject to seizure.

The decree is reversed, with costs, and the cause is remanded for further proceedings, not inconsistent with this opinion.

SMYTH, Chief Justice (dissenting). Not being able to believe any of the testimony on which Magg rests his title, I am compelled to refuse my assent to the opinion just handed down. It is not my purpose to go into the matter very deeply. I shall indicate only some of the things upon which I base my opinion.

The stock involved is valued at $200,000. It paid annually in dividends 30 per cent. on its face value, and the sum of $80,000 derived from it as dividends is now in the hands of the Alien Property Custodian. Sachs, a German subject, was owner of the stock until April, 1915, when he transferred it to Wustenfeld, also a German subject, in consideration of the conveyance to him by Wustenfeld of a four-fifths interest in the business of Gottschalk & Co., of Germany. On February 22, 1917, Wustenfeld pretends to have sold the stock to Magg for $200,000, or 840,000 marks, 10,000 marks to be paid in cash, and the remainder "by counter-payment." On the next day Wustenfeld transferred his claim against Magg for the "counter-payment" to Sachs, and received from the latter a retransfer of the four-fifths interest in the business of Gottschalk & Co., plus 10,000 marks, or $2,380, a negligible amount, when the value and earning power of the stock are considered. Germany was then in the midst of the war. The United States had not yet entered it. Under these circumstances it is most remarkable that Wustenfeld should be willing to exchange his stock in a United States corporation, valued at $200,000 and paying large dividends, for $2,304 and an interest in a German concern— the same interest which he had surrendered for the stock less than two years before, there being nothing to show that this interest represented a profitable investment.

Magg was the maternal uncle of Sachs. The "counter-payment" mentioned in the sale of the stock is said to refer to a debt which Magg claimed was due to him from Sachs' parents. He declares that Sachs' father and mother owed him 660,000 marks, and that he and the younger Sachs made a written agreement on July 15, 1914, in which the latter promised to pay that sum to him, with 5 per cent. interest. How was this debt incurred by the elder Sachses? It is asserted that in 1871 they owed him 700 florins, or $285.60, with interest at 4 per cent., and that this amount was increased from time to time until it reached $1,103.13 in 1879. In 1880 there were certain court proceedings in which the debt was fixed at 3,000 francs, or $714, to bear 3 per cent. interest annually from February 15, 1880. Magg testified that at the time of the court proceedings he waived his claim to this debt, but that he hoped the Sachses would pay it some time. The elder Sachs, his brother-in-law, lived until 1897, and, although financially able to pay the debt, Magg never asked him to do so, and neither he nor anybody else ever paid anything to him upon it. Why the younger Sachs and Magg came together, if they are to be believed, in July, 1914, and made the written agreement just mentioned, does not appear. If Sachs desired to pay the debt then, he had the ability to do so, for he was rated as a millionaire. But how the 3,000 marks, $761.60, of 1880,

jumped to 660,000 marks in 1914, remains unexplained. If you take 3,000 marks, and figure the interest on them at 3 per cent. per annum, the rate fixed by the court in 1880, and compound the interest annually from 1880 until July, 1914, 33½ years, you will reach the sum of only $1,954.57. If figured at 5 per cent., the rate fixed in the 1914 agreement, the amount due would be $3,743.90. Yet Sachs by the agreement promised to pay $157,142. I do not believe that the agreement was made on July 15, 1914, but am convinced it was made at a later date, for the sole purpose of bolstering up the claim which Magg now asserts.

Now, let us look a little more closely into the pretended purchase of the stock by Magg. He was, and is, a Swiss citizen. It was very desirable on the part of Sachs and Wustenfeld that the stock should be placed in his name, so that none of the belligerents might be able to seize it as the property of an enemy alien. According to the testimony Sachs called Magg to Germany without telling him what the purpose of the call was. He stayed at the Sachs home. Sachs asked him if it would be all right if he paid in American money the claim he (Magg) had against Sachs' parents, and if he was willing to have the affair settled then. He also inquired whether Magg would be satisfied with what he (Sachs) would give him, to which he replied, "Yes."

The next day he went with Sachs to his office, and there met Wustenfeld for the first time. He made no inquiries of any one as to the value of the stock. Sachs says that Magg knew when he came to Germany that "he was to buy an object," and consequently he took some money along, but Magg says that he had no notice of the purpose for which he was summoned by Sachs. The latter says he did not tell Magg to bring any money, but none the less he had with him 10,000 marks. Wustenfeld declares that on February 22, 1917, the day before the contract of sale between Wustenfeld and Magg was made, it was arranged between him and Sachs that he should "hand over to Mr. Magg" the shares of stock for which he was to receive the interest from Gottschalk & Co., and that he sold the stock to Sachs. He further said that, when Sachs proposed to him to buy the interest in the stock, he "was willing to do so." This occurred on cross-examination. On redirect he was told to read carefully his contract with Magg and then say to whom he had sold the stock. After having read the contract he answered that he had sold it to Magg. He also testified that he had never met Magg before, and that the only thing he said to him during the meeting was, "How do you do?" that his talk was with Sachs and not with Magg, and that Sachs did the talking.

According to this testimony Magg and Wustenfeld, parties to this important financial transaction, never met but once, never discussed the value of the stock, Magg did not inquire of any one relative to its value, and the only words which passed between them were, "How do you do?" uttered by Wustenfeld. Moreover, the latter repeatedly says he sold the stock to Sachs, but there is a writing in which he declares he sold it to Magg. By that writing Magg was to pay for it 10,000 marks and discharge the remainder of the purchase price by "counter-payment." On the next day Magg and Sachs claim to have

signed a paper which recites that Wustenfeld had transferred his claim of 830,000 marks ($200,000) against Magg to Sachs, and that the latter applied upon the claim 660,000 marks due from him to Magg under the agreement of July, 1914, deals with other items, and concludes by saying that Magg owes Sachs 84,000 marks. This imposes on Magg a different obligation from that imposed by the paper signed by him and Wustenfeld.

If Sachs desired to discharge the alleged debt of his parents to Magg, why did he not transfer to him his interest in the Gottschalk Company, instead of transferring it to Wustenfeld, and then having the latter transfer his American stock to him (Sachs) that he might deliver it to Magg? Did Magg bring the 10,000 marks with him from Switzerland under the circumstances disclosed? The sum is equivalent to $2,380, and it is most unreasonable to suppose that he, without previous notice, and in war time, would bring that amount with him. He did not produce any check or account book to show that it came from his funds, nor does he claim to have had it with him, nor explain where it came from, nor does anyone else. Magg testified on his direct examination, "We handed him, Wustenfeld, the 10,000 marks in cash." Who is meant by "we"? Presumably himself and Sachs, not himself only. Wustenfeld says nothing about the matter save that the 10,000 marks were paid to him in bank notes.

Sachs allowed Magg 4,000 marks on account of his expenses in coming to Germany, thus reducing the balance due him to 80,000 marks. Why should Sachs have paid Magg's expenses if he came to Germany on his own business? Magg says he later deposited in a German bank 80,000 marks to meet the payment due to Sachs. This is the way it was done, according to the manager of the Swiss bank, where, it is said, Magg obtained the money: The fund was transferred to the German bank, and there deposited in the name of the Swiss bank. This deposit, according to the manager, could be assigned by Magg at any time, or could have been collected by him from the bank by check. In other words, the money was subject to Magg's control, and the bank books disclose that it has not been paid to any one. I do not think it was ever the intention of Sachs or Magg that this money should be collected by the former. If it was, why has it remained in the bank so long?

I do not believe that the agreement of July 15, 1914, between Sachs and Magg, or the papers of February 22 and 23, 1917, were signed on the dates, respectively, which they bear, but that they were signed after the passage of the Trading with the Enemy Act, and for the purpose of evading it, or, if the papers of February 22 and 23 were made at the time they purport to have been made, that they did not, and were not intended to, have the effect of transferring to Magg the stock in question.

It is true no one testifies that the story which appellant and his witnesses tell is false, but the circumstances which indicate its improbability are many and convincing. The things upon which Magg relies are hard to believe. They are improbable and unnatural because they are contrary to common experience. In Vreeland v. Vreeland, 48 N. J. Eq. 56, 21 Atl. 627, the Vice Chancellor was called on to accept

or reject the testimony of a witness uncontradicted by other witnesses. In refusing to accept it he said:

"Evidence, to be worthy of credit, must not only proceed from a credible source, but must, in addition, be credible in itself. And by this is meant that it shall be so natural, reasonable, and probable, in view of the transaction which it describes or to which it relates as to make it easy to believe it."

To the same effect see Taylor v. Taylor (R. I.) 90 Atl. 746, 750.

For the reasons given, and others that might be stated, I think the decree of the lower court was right, and should be affirmed.