STANDARD OIL CO. (NEW JERSEY) et al.
v. MARKHAM, Alien Property
Custodian.

District Court, S. D. New York.

Nov. 7, 1945.

See also 57 F.Supp. 332; 61 F.Supp. 813.

John W. Davis and Theodore S. Kenyon, both of New York City (Edward F. Johnson, Ralph M. Carson, Edgar F. Baumgartner, Douglas H. Kenyon, Harold W. Bissell, Davis, Polk, Wardwell, Sunderland & Kiendl, and Kenyon & Kenyon, all of New York City, on the brief), for plaintiffs.

Philip Werner Amram, Sp. Asst., to Atty. Gen. (John F. X. McGohey, U. S. Atty., of New York City, Herbert Wechsler, Asst. Atty. Gen., Harry LeRoy Jones, David R. Mason, and Roy C. Frank, Sp. Assts. to Atty. Gen., William L. Lynch, Asst. U. S. Atty., of New York City, and John Ernest Roe, Gen. Counsel to Alien Property Custodian, of Washington, D. C., on the brief), for defendant.

WYZANSKI, District Judge.

### I.

In this action under § 9 (a) of the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 9 (a), plaintiffs seek to recover from the Alien Property Custodian (1) many hundreds of patents relating principally to the Hydrocarbon Field, herein called Class A S.I.G. patents, (2) many hundreds of patents useful in the Hydrocarbon Field, herein called Class B S.I.G. patents, (3) many Jasco patents for processes relating to Acetylene Arc, Paraffin Oxidation, Oppanol and Buna, (4) 200 shares of S.I.G. stock, (5) 5 shares of Jasco stock and (6) 425 shares of USAC stock.

The 91 findings of fact and 43 conclusions of law, covering 62 typewritten pages, filed herewith, state the details of the case, and this opinion outlines only so much of the controversy as is necessary for an understanding of the principal legal questions discussed hereafter.

## II.

Factually this case is divisible into three chronological parts—the first from the beginning of the relations of I.G. and the Jersey group in 1926 until the outbreak on September 1, 1939 of World War II, the second from the outbreak of that war until the entry of the United States December 8, 1941, and the third from December 8, 1941, until the complaint was filed in this action on July 13, 1944.

## III.

In the first period there were three series of transactions of importance—those of 1929 involving S.I.G. patents and stock, those of 1930 involving Jasco processes and stock and those of 1938 involving USAC stock.

The 1929 transactions center about the Four-Party Agreement. I.G. and the Jersey group created a new corporation, S.I.G., which issued, at $100 a share, 200 shares of its stock to I.G. and 800 shares to the Jersey group. By its charter S.I.G. was prohibited from engaging in manufacturing operations of any kind, and that prohibition could be altered only by holders of 85% of the stock of S.I.G. I.G. and the Jersey group used S.I.G. for the exploitation outside of Germany of two groups of patents covering inventions by I.G.—the Class A S.I.G. patents which relate principally to the Hydrocarbon Field and the Class B S.I.G. patents which were merely useful in that Hydrocarbon Field. I.G. agreed to give to S.I.G. an assignment of the legal title to the Class A patents, but only licensing rights for the Class B patents. S.I.G. was to exploit both groups of patents by issuing licenses, but not by making the inventions, and S.I.G. was to divide the revenue so that roughly $\frac{1}{5}$ went to I.G. and $\frac{4}{5}$ to the Jersey group or its assignees. For this transaction involving I.G. inventions the Jersey group gave I.G. as consideration over 35 million dollars in stock and cash.

Pursuant to the Four-Party Agreement, I.G. before World War II assigned to S. I.G. many, but not all, of the Class A patents, and gave to S.I.G. exclusive licensing rights for the Class B patents.

The 1930 transactions center about the Jasco Agreement. I.G. and the Jersey group created a new corporation, Jasco, which issued at $800 a share 5 shares of its stock to I.G. and 5 shares to the Jersey group. I.G. and the Jersey group used Jasco for experimental work upon petroleum, bitumen and natural gas as starting materials. The Jasco agreement committed each side when it originated a process within the Jasco field to negotiate with the other party the specific terms on which Jasco might have the licensing rights—those terms were to cover royalty rights, questions of control and like problems.

Before World War II, I.G. and the Jersey group by what is called the Oppanol Memorandum made specific terms for one Jasco process, Oppanol, invented by I.G. I.G. also submitted to Jasco the processes for Acetylene Arc, Paraffin Oxidation and Buna as developed prior to 1934. These submissions constituted informal permissions to Jasco to experiment regarding the improvement and the uses of the processes.

The 1938 transactions involved I.G., the Jersey group and two other unrelated oil groups, all of whom joined to form USAC, a corporation in the hydrocarbon synthesis field. This corporation was interested in the Fischer-Tropsch process for making gasoline out of coal. USAC, issued at $100 a share a total of 1700 shares, of which 850 were held by S.I.G. to pay for those 850 shares the Jersey group contributed $\frac{4}{5}$ of the money required, that is $68,000, and I.G. contributed $\frac{1}{5}$ or $17,000.

## IV.

In the second chronological part of this case, the Jersey group took steps in the light of the war situation which had developed in Europe. These steps included the Jersey group's purchase in September 1939 of I.G.'s 200 shares of S.I.G. stock, the Hague Conference of September 1939, the creation of the Currie Trust, the negotiations covering the Lauryl Amine patent, the creation of the Schaefer-Koechling Trust, the handling of Jasco processes including Buna and the purchase of 170 shares of USAC stock.

Mr. Teagle of the Jersey group initiated and others carried through before the end of September 1939 a transaction, unconnected with any other, whereby the Jersey

group bought for $20,000, which was their full value, the 200 shares of S.I.G. to which I.G. had legal and equitable title.

Mr. Howard of the Jersey group and Dr. Ringer of I.G. met in the last week of September 1939 at the Hague. Responding to Jersey's earlier cabled request, Dr. Ringer had brought with him assignments in blank of all the non-German patents falling within Class A S.I.G., Class B S.I.G. and (with the exception of Buna-N and Buna-S) the Jasco Agreement. The negotiators prepared the so-called Hague Memorandum which was neither an accurate summary of the past dealings of their companies, nor a complete or faithful representation of the agreements made at the Hague. Its purported division of the world of Jasco patents upon a territorial basis was not intended to be a binding agreement.

The real agreement which was made by Mr. Howard and Dr. Ringer and which was later ratified by their principals can be gleaned only after a scrutiny of many documents and of the oral testimony of Mr. Howard. Such scrutiny, the details of which are noted in the findings of fact, filed with this opinion, reveals that the parties' real agreement was as follows. S.I.G. should have the complete legal title to and, subject to certain equitable interests reserved to I.G., the full equitable interest in all the Class A S.I.G. patents. S.I.G. should have the nominal legal title to the Class B S.I.G. patents and the Jasco patents, subject, however, to an obligation to reconvey at the end of World War II or on demand to I.G. S.I.G. should have in the Class B S.I.G. patents the licensing and royalty rights specified in the Four-Party Agreement; Jasco and the Jersey group should have in the Oppanol patents the licensing and royalty rights specified in the Oppanol Memorandum; and I.G. should retain the remaining equitable interest in the Class B S.I.G. patents and the Oppanol patents, and should retain the entire equitable interest in all the other Jasco patents at least until the parties could at some indefinite future date, in the spirit of the Jasco Agreement, negotiate specific terms for those Jasco processes. The Jersey group should advance the money, including $4,000 to I.G.'s New York friend, Dr. Duisberg, necessary to allow the Jersey group to hold for the account of I.G., until the end of World War II or until demand, the 5 shares of Jasco stock owned by I.G.

Upon his return from the Hague to the United States, Mr. Howard placed the assignments of the Class A and Class B S.I.G. patents in the vaults of the Jersey group. March 22, 1940, Mr. Howard delivered all those patents to Mr. Currie, an executive of the Jersey group, to hold the title of the patents in conformity with the Four-Party Agreement. I.G. consented to this trust and re-assigned the legal title to these patents to Mr. Currie as trustee.

Later a question was raised as to the status of a group of so-called "AD" patents, of which United States Patent No. 2,-191,295 for Lauryl Amine is typical. I.G. submitted the Lauryl Amine patent to Mr. Currie as trustee to hold upon the same terms as if it were a Class B patent subject to the Four-Party Agreement.

After Mr. Howard's return from the Hague, the Jersey group paid out of its own funds $4,000 to Dr. Duisberg, and out of I.G.'s funds $146,440 to Hambros Bank of London in order to release the 5 shares of Jasco stock owned by I.G. On or before March 1, 1940 Mr. Carl Mueller, an attorney for I.G., endorsed and delivered the stock to Messrs. Schaefer and Koechling, two executives of the Jersey group, as "trustees." The next week, March 8, 1940, Messrs. Schaefer and Koechling agreed to hold the shares upon a trust which gave the Jersey group the right to voting control and dividend payments, but which stipulated that when patents of Jasco were sold Messrs. Schaefer and Koechling as trustees of Jasco stock should see to it that Jasco received "an equitable and separately specified monetary compensation."

Following the creation of the Schaefer-Koechling Trust, the executives of the Jersey group using the blank assignments brought by Mr. Howard from the Hague wrote in the name of Jasco as assignee of all the Jasco patents for the United States and some of the Jasco patents for countries outside the United States, the British Empire, the French Empire and Iraq.

December 15, 1939, prior to the creation of the Schaefer-Koechling Trust, I.G. delivered assignments to Jasco of the United States, Canadian, British and French patents for the Buna or synthetic rubber part of the Jasco field. June 12, 1940, I.G. made delivery to Jasco of further assignments of the same character.

October 23, 1939, I.G. by cable accepted the October 10, 1939, offer of the Jersey

group to the effect that S.I.G. would take over the legal title to the 170 shares S.I.G. held as agent for I.G. on the understanding that "SIG would continue to treat your [i.e. I.G.'s] shares for your account." Later on November 3, 1939, the Jersey group offered I.G. $100 if it would "assign to us whatever title you may have in said shares stop This would in no way affect the contract obligations between us concerning division of dividends therefrom." On January 4, 1940, after S.I.G. already had been registered on the stock ledger of USAC as owner of the 170 shares, I.G. accepted the offer, and on January 10, 1940, the Jersey group paid the $100.

All of the steps recited in the last six paragraphs were taken in the light of and as a means of implementing, the real agreement made by Mr. Howard and Dr. Ringer at the Hague.

## V.

In the third chronological part of this case, that is the period of United States participation in World War II, the outstanding events were the Custodian's Vesting Order No. 1 served upon plaintiffs March 25, 1942, at 2:15 P.M., the Consent Decree entered by the United States District Court for the District of New Jersey on the same day but after 4:15 P.M., and the Custodian's Supplemental Order No. 1 to vesting Order No. 1 served upon plaintiffs May 24, 1944.

Vesting Order No. 1 of March 25, 1942, vested in the Custodian merely "all right, title and interest of" I.G., not of others, in the Class A and Class B S.I.G. patents, the Lauryl Amine patent, the Jasco patents, the S.I.G. stock, the Jasco stock and the USAC stock.

The Consent Decree arose out of Civil Action No. 2091 in the District of New Jersey which was a suit in equity under the federal anti-trust laws. As plaintiff in that case the United States sought to enjoin all the plaintiffs in this case as well as others from participating in an alleged combination and conspiracy in restraint of trade. I.G. was not a party to that case. However, the then Alien Property Custodian, after serving Vesting Order No. 1, joined as a party to the proceedings, and he together with the United States and all the plaintiffs in the case at bar consented to a decree which the District Court entered on March 25, 1942, a few hours after the Custodian had served upon the Jersey group Vesting Order No. 1.

These were the essentials of that Consent Decree: Article III adjudges that, with exceptions not material here, all arrangements whatsoever between Standard and I. G. or any of their subsidiaries were unlawful, and enjoins those who were defendants in that New Jersey case from the further performance of any of their provisions. Article IV directs the there defendants to discontinue all existing relations with I.G., to transfer to S.I.G. all their right, title and interest in Class A and Class B S.I.G. patents, and to transfer to Jasco all their right, title and interest in Jasco patents. Subsequent paragraphs of the same Article IV require S.I.G. and Jasco to issue licenses, unrestricted as to use or field, to all applicants, royalty-free for the duration of the war emergency and subject thereafter to royalty terms supervised by the Attorney General and controlled by the New Jersey District Court. Article V (3) prohibits the there defendants from "accounting to I.G. in respect of receipts from * * * any agreement declared illegal." Article VII declares that "nothing contained in this decree shall affect or diminish any right, title or interest of the [there] defendants * * * in or to or under any * * * patents, licenses under such patents * * * or shares of corporate stock * * * or impair any rights or remedies" of said defendants. Article XII recites that the Custodian "agrees to execute such further transfers of property to S.I.G. or Jasco as may be necessary to carry out the provisions of the decree, including the provisions of the decree limiting or prohibiting royalties under those patents and providing for compulsory licensing under them." That consent, however, "shall not affect such further rights of the Alien Property Custodian to * * * property * * * unaffected by the terms of this decree, and all such right * * * as between * * * the Alien Property Custodian and any of the [there] defendants is hereby expressly reserved."

Supplemental Order No. 1 to Vesting No. 1, served upon plaintiffs May 24, 1944, recited that Vesting Order No. 1 in vesting in the Custodian the rights of I.G. had in fact and law vested in the Custodian all the legal and equitable interest in the Class A and Class B S.I.G. patents, the Lauryl Amine patent, the Jasco patents, the 200 shares of S.I.G. stock registered in the name of Standard, the 5 shares of Jasco stock registered in the names of Messrs. Schafer and Koechling and 425 of the 850

shares of USAC stock registered in the name of S.I.G. Then the Supplemental Order, without prejudice to the aforesaid recitals, vested in the Custodian "the full, complete, and unqualified legal title" to the properties just mentioned.

## VI.

The facts just summarized raise, among other issues, these important questions of law: Were the purported assignments of the legal title to many Class A S.I.G. patents made by I.G. to S.I.G. prior to September 1939 valid as a matter of patent law in view of the restrictions imposed upon S.I.G.'s activities by its corporate charter and by the Four-Party Agreement? Did the provisions of the Jasco Agreement give either to the Jersey group or to Jasco any legal or equitable interest in I.G.'s inventions within what is called the Jasco field? Was the acquisition from I.G. by the Jersey group of the legal title to and the equitable interest in 200 shares of S.I.G. stock effective against the United States or the Custodian in view of the fact that at the time of the acquisition World War II had begun and both I.G. and the Jersey group were motivated by war conditions in arranging the transaction? Was the acquisition from I.G. by the Jersey group after September 1, 1939, of the legal title to the remaining Class A S.I.G. patents, to the Class B S.I.G. patents, to the Lauryl Amine and similar AD patents, to the Jasco patents, to the 5 shares of Jasco stock and to the 170 shares of USAC stock, and of equitable interests in the Lauryl Amine and similar AD patents, in the Jasco patents, in the 5 shares of Jasco stock and in the 170 shares of USAC stock effective against the United States or the Custodian in view of what the Court has found to be the real agreement made at the Hague during the last week of September 1939? What effect did the Consent Decree have upon the titles and interests which the Custodian had seized under Vesting Order No. 1 or Supplement No. 1 to Vesting Order No. 1? Which of the just claims of plaintiffs are claims to property so as to be cognizable in this proceeding?

## VII.

The first important question of law is whether the purported assignments of the legal title to many Class A S.I.G. patents made by I.G. to S.I.G. prior to September 1939 were valid assignments as a matter of patent law.

The Custodian has challenged the validity of those assignments principally on the ground that, because of restrictions embodied in the charter of S.I.G. and in the Four-Party Agreement, the grants to S.I.G. must be construed under principles of patent law as grants of mere licenses and not as grants or assignments of legal title. That is not the only contention of the Custodian—for in order to show that there were no valid assignments of legal title to Class A S.I.G. patents the Custodian also asserts that (1) the negotiations preliminary to the Four-Party Agreement showed a studied effort of I.G., the Jersey group and S.I.G. to avoid the acquisition of legal title by S.I.G.; (2) the entire text, as distinguished from Article II, of the Four-Party Agreement, reveals that I.G. did not agree to give legal title to S.I.G.; and (3) S.I.G. and members of the Jersey group in intra-mural communications, in their books of account, in their tax practices and otherwise demonstrated that they did not regard S.I.G. as the holder of legal title. Those three subsidiary contentions are answered in the findings of fact and conclusions of law filed herewith. In this opinion it will be sufficient to deal with the Custodian's main argument that the purported assignments of legal title were ineffective because under the limitations of its own corporate charter and of the Four-Party Agreement S.I.G. could not manufacture under the patents but could use them only to license others.

This argument of the Custodian is bottomed upon the rulings in Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 36, 43 S.Ct. 254, 67 L.Ed. 516; Universal Oil Products Co. v. Root Refining Co., D.C.D.Del., 16 F.Supp. 846, 852, affirmed, 3 Cir., 93 F.2d 186; and Six-Wheel Corporation v. Sterling Motor Truck Company, 9 Cir., 50 F.2d 568. From those authorities the Custodian spells out the theory that where a person has not the right to make, use or vend the invention that person cannot be the holder of the legal title to the patent.

■ The theory of the Custodian is not in accord with the patent law. Where the patentee assigns to another the exclusive right to make, use and vend the invention, but that other by a collateral agreement disables himself from making, or using, or vending the invention, or that other grants back to the assignor an exclusive license, there is nonetheless a valid assignment of

title. Waterman v. Mackenzie, 138 U.S. 252, 261, 11 S.Ct. 334, 34 L.Ed. 923; Littlefield v. Perry, 21 Wall. 205, 219, 222, 22 L.Ed. 577; McDuffee v. Hestonville M. & F. Pass. R. Co., 3 Cir., 162 F. 36, 38, 39. See General Aniline & Film Corporation v. Commissioner of Internal Revenue, 2 Cir., 139 F.2d 759, 760.

This familiar doctrine of patent law is in no way denied by the Crown Die & Tool case. There the patentee did not purport to assign the patent itself. The patentee retained the entire right to make, use and vend the invention and gave the other only the right to sue a single competitor. See 261 U.S. at pages 25, 26, 43 S.Ct. at pages 254, 255, 67 L.Ed. 516. That transaction was held to be an ineffective assignment because it would sanction an "effort * * * to divide up the monopoly of patent property so that the patentee retains the right to make, use and vend, but gives to many different individuals the right to sue certain named infringers, respectively, and that with the sole motive of harassing them * * *. If held legal, it would give the patentee an opportunity without expense to himself to stir up litigation by third persons that is certainly contrary to the purpose and spirit of the statutory provisions for the assigning of patents." 261 U.S. at pages 38, 39, 43 S.Ct. at page 257, 67 L.Ed. 516.

The Universal Oil Products case cited by the Custodian is in reality an authority against him. The court there upheld the title of a patentee, the so-called Old Company, which had assigned to another, the so-called New Company, not the patent itself but all "rights and privileges now owned by the Old Company" [16 F.Supp. 847]. In short, the case stands for the proposition that a patentee who by a collateral agreement has disabled himself for making, using or vending may nonetheless be the lawful holder of the legal title.

The Six-Wheel Corporation case might perhaps be distinguished on the narrow ground that there the patentee purported to assign the legal title to another "subject to the condition that said Company [i.e. the assignee] shall not itself manufacture, use or sell any device or devices embodying or containing said invention" [50 F.2d 573]. But it is more candid to say that the decision of the Ninth Circuit Court of Appeals is so plainly at variance with the weight of authority that it should be discredited and not distinguished.

From the foregoing analysis, it follows that S.I.G. acquired valid legal title to, and an equitable interest (of the scope described in the Four-Party Agreement) in, all the Class A patents which were covered by general or individual assignments from I.G. to S.I.G. prior to September 1939. The Custodian did not vest that legal title or equitable interest in himself by Vesting Order No. 1, served March 25, 1942, inasmuch as that order covered interests belonging on that date to I.G., but to no others. However, the Custodian by his Supplemental Order No. 1, served May 24, 1944, did seize the legal title and equitable interest of S.I.G. in the particular Class A S.I.G. patents referred to in this paragraph. That seizure was not authorized by the Trading with the Enemy Act and gives rise to a valid claim by one of the Jersey group, plaintiff S.I.G.

■ Before turning to the next topic it may be convenient to note here that it is agreed by the parties that between the time of the Four-Party Agreement of 1929 and the conference at the Hague of September 1939, I.G., and not S.I.G. or any member of the Jersey group, held legal title to the Class B S.I.G. patents. S.I.G. and others in the Jersey group had during that time equitable interests in those Class B patents. The scope of those interests is measured by the Four-Party Agreement, and includes licensing rights, royalty rights and other rights. Those interests were not mere contractual rights. They were property rights of the type that would have been protected against the holder of the legal title to the patents, or against third parties with notice (New York Phonograph Co. v. Edison, C.C.S.D.N.Y., 136 F. 600, 606, affirmed, 2 Cir., 144 F. 404; Werderman v. Societe Generale d'Electricite, 19 Ch.D. 246), or against the holder's trustee in bankruptcy. In re Waterson, Berlin & Snyder Co., 2 Cir., 48 F.2d 704. They fall within that classification of property rights sometimes denominated "equitable servitudes." See Chafee, Equitable Servitudes on Chattels, 41 Harv.L.Rev. 945. Being property of American corporations, those equitable interests were not properly subject to seizure by the Alien Property Custodian under the Trading with the Enemy Act. This remains true even if the patents with respect to which the equitable interests existed were patents which belonged to an enemy and were properly seized as such by the Custodian. See Trading with the

Enemy Act § 8, 40 Stat. 411, 418, 50 U.S. C.A. Appendix, § 8.

One other point may be conveniently noted here. It is agreed by the parties that between the time of the Four-Party Agreement of 1929 and September 1939, I.G., and not Standard or any member of the Jersey group, had the complete legal title to and the full equitable interest in 200 of the 1000 shares of stock of S.I.G.

## VIII.

Turning now from the S.I.G. situation, this opinion next addresses itself to the legal status of the Jasco patents and processes prior to September 1939. The fundamental issue is whether the provisions of the Jasco Agreement of 1930 gave either to the Jersey group or to Jasco any legal or equitable interest in I.G.'s inventions within what is called the Jasco field.

Plaintiffs contend that the Jasco Agreement gave them or one of them an equitable interest in I.G.'s inventions of processes within the Jasco field, that is, processes using petroleum, bitumen or natural gas as a starting material.

But the Jasco Agreement itself guards against the creation of such equitable interests enforceable by a court. Although Article III of the Jasco Agreement committed I.G. to grant suitable licenses of Jasco field processes to Jasco, other provisions of the Agreement make it plain that despite that commitment I.G. retained freedom to negotiate the specific terms of the grant. Thus Paragraphs A through E of Article III state that "as a condition precedent to the grant * * * agreement between the parties on the following points [definition of the process, royalty rights, deciding voice in the management, and so forth] is required." And Article VII recognizes that there may be a "failure of agreement" on the specific terms.

The Jasco Agreement, in short, imposed upon I.G. no more than an obligation in good faith to seek to negotiate with the Jersey group a supplementary agreement for each new Jasco process. It was like the statutory obligation resting upon certain employers to seek to negotiate with a labor organization a collective bargaining agreement—an obligation which does not imply that the obligor must make an agreement. Compare Virginian Railway Co. v. System Federation No. 40, 300 U.S.515, 549–553; 57 S.Ct. 592, 81 L.Ed. 789; H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 525, lines 15–18,

61 S.Ct. 320, 85 L.Ed. 309. It did not ipso facto create equitable interests in specific processes, because the Jasco agreement lacked certainty and the principal details had to be supplied by subsequent agreements which were made "conditions precedent" to any grant. Compare Am.Law Inst., Restatement Contracts, § 32, illustration 10; Williston, Contracts, Rev.Ed., §§ 41, 42; Chiapparelli v. Baker, Kellogg & Co., 252 N.Y. 192, 169 N.E. 274, 277; Davis v. General Foods Corp., D.C.S.D.N.Y., 21 F.Supp. 445.

■ While the Jasco Agreement of 1930 did not itself create equitable interests, it should be here mentioned that the Oppanol Memorandum of February 16, 1933, did give the Jersey group and Jasco enforceable equitable interests in one particular Jasco field process, Oppanol. That memorandum included exactly the specific terms as to definition of the process, royalty rights, deciding voice in the management, field of use and similar factors which were missing in the Jasco Agreement of 1930. It follows that this equitable interest or servitude since it belonged to the Jersey group and Jasco, and not to I.G., was not embraced by Vesting Order No. 1, served March 25, 1942. It was, however, covered by Supplemental Order No. 1, served May 24, 1944. That 1944 seizure by the Custodian was not authorized by the Trading with the Enemy Act and gives rise to a valid claim by plaintiff Jasco and by such other plaintiffs as acquired equitable rights in the Oppanol Memorandum.

## IX.

The previous sections of this opinion show that on September 1, 1939, at the outbreak of World War II the legal situation was that the Jersey group had the legal title to and an equitable servitude upon such of the Class A S.I.G. patents as had been covered by general or specific assignments, an equitable servitude upon the Class B S.I.G. patents and upon the Oppanol patents, and both the complete legal title to and the full equitable interest in 800 shares of S.I.G. stock, 5 shares of Jasco stock and 680 shares of USAC stock. Now it becomes necessary to determine what, if any, additional titles or interests the Jersey group acquired in what has been called the second chronological period, from the outbreak of World War II until the United States became a belligerent on December 8, 1941.

With respect to that period the first legal issue presented is whether the acquisition from I.G. by the Jersey group of the legal title to and the equitable interest in the remaining 200 shares of S.I.G. stock was effective against the United States or the Custodian.

Plaintiffs' position is that they validly acquired in September 1939 the legal title to and equitable interest in the 200 shares of S.I.G. stock originally owned by I.G.

The findings of fact show that the formalities of a sale were fully executed, that the price was fair, that the parties intended in good faith that title and beneficial ownership should pass, that there was no thought of rescission or readjustment after the end of the war and that the transaction was unconnected with any other.

Upon those findings the Custodian's only basis for attacking the sale is that it was made after World War II began, though before the United States was a belligerent, and with the intent of avoiding the consequences of the war and the possible involvement of the United States.

■■■ That is not an adequate basis in law for setting aside the sale or allowing the Custodian to seize the property. There is no statutory or common law principle which prohibits an American corporation from acquiring American assets from a corporate creature of a belligerent power with which the United States is not at war. It is well settled that genuine transfers of property, made in contemplation of war and for the specific purpose of avoiding its normal consequences, are valid. Magg v. Miller, 54 App.D.C. 226, 296 F. 973; Miller v. Herzfeld, 3 Cir., 4 F.2d 355; Waldes v. Schall, D.C.S.D.N.Y., 11 F.2d 444, 452, affirmed, 2 Cir., 11 F.2d 453; Metz v. Garvin, D.C.S.D.N.Y., 3 F.2d 182. All that is necessary is that before "the whole nation are embarked on one common bottom" (see The Rapid, 8 Cranch 155, 161, 3 L.Ed. 520) the transfer be in every respect finally consummated without thought of subsequent modification.

■■■ The transfer from I.G. to Standard of the complete legal title to and the full equitable interest in the 200 shares of S.I.G. stock met those tests. Being stock owned by Standard and not by I.G., those 200 shares were not affected by the Custodian's Vesting Order, served March 25, 1942. However, the shares were seized by Supplemental Order No. 1, served May 24, 1944.

That 1944 seizure by the Custodian was not authorized by the Trading with the Enemy Act and gives rise to a valid claim by one of the Jersey group, Standard, to a return of the 200 shares together with all dividends paid thereon since the transfer of the stock to the Custodian. Henkels v. Sutherland, 271 U.S. 298, page 299, lines 29–31, page 300, lines 27–32, 46 S.Ct. 524, 70 L.Ed. 953.

## X.

An issue of much greater practical importance to the parties arises out of the other transfers which occurred in the fall of 1939 and the spring of 1940. That issue is whether the acquisition from I.G. by the Jersey group after September 1, 1939, of the legal title to the remaining Class A S.I.G. patents, to the Class B S.I.G. patents, to the Lauryl Amine and similar AD patents, to the Jasco patents, to the 5 shares of Jasco stock and to the 170 shares of USAC stock, and of equitable interests in the Lauryl Amine and similar AD patents, in the Jasco patents, in the 5 shares of Jasco stock and in the 170 shares of USAC stock was effective against the United States or the Custodian.

The Custodian alleges that all those transfers were sham transactions and that the parties had a concealed purpose to reverse or readjust those transactions at the end of World War II, or upon I.G.'s demand. He therefore contends that within the intendment of the Trading With the Enemy Act and the ratio decedendi of Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604, the transfers were not effective against the United States or the Custodian.

For the most part the issues on this branch of the case turn upon questions of fact. As the findings of fact and the summary of them in the forepart of this opinion show, substantially all those questions have been resolved by the Court in support of the Custodian's contention and adversely to plaintiffs. The Court is satisfied that the overriding real agreement of the Jersey group and I.G. was that (with the exception of the transfer of the legal title to and an equitable interest in the remaining Class A S.I.G. patents and an equitable interest in the Lauryl Amine patent) these transfers both of legal title and equitable interest were to be null and void at the pleasure of I.G., and the parties intended that after the close of World War II the Jersey group and I.G. would make whatever deal then

seemed to be appropriate. To quote the language of Mr. Justice Van Devanter in Stoehr v. Wallace, 255 U.S. 239, 251, 41 S.Ct. 293, 298, 65 L.Ed. 604, the agreement "was not intended as a genuine business transaction, but was made to avoid inconveniences which otherwise might ensue from a state of war; and that the parties intended to leave the beneficial ownership in the German corporation."

On this view of the evidence, the rule of law is plain that both the legal titles and the equitable interests which I.G. had in the properties described three paragraphs above (with the exception of the legal title to and part of the equitable interest in the Class A S.I.G. patents, part of the equitable interest in the Lauryl Amine patent, and a $4,000 lien upon the 5 shares of Jasco stock, of all of which more will be said below) constituted enemy property within the Trading with the Enemy Act and were lawfully seized as property of I.G. by the Custodian's Vesting Order No. 1, served March 25, 1942.

This result is in accord with the well-settled public policy underlying the Trading with the Enemy Act that in time of war the government shall have the right to seize and sequester all property openly or secretly held in this country for the account of one who owes allegiance to and dwells within the territory of this country's enemies. The policy is not new. Its roots go back to Thirteenth Century English law. Pollock and Maitland, History of English Law, 1st Ed., p. 445. It is a policy designed to cripple the enemy's commerce, to capture his property and to decrease his capacity for prolonging hostilities through the use of private resources. Esposito v. Bowden, 1875, 7 El. & Bl. 763, 799; Porter v. Freudenberg, [1915], 1 K.B. 857, 867, 868; see Sir Arnold D. McNair, Legal Effects of War, 2d Ed. 1944, pp. 125, 126.

There must be noticed three reservations with respect to the ruling just enunciated that all the transfers considered in this part of the opinion were ineffective against the United States and the Custodian.

The first reservation is that the Jersey group and I.G. had the bona fide intent to make a final and binding transfer to S.I.G. of the legal title to and part of the equitable interest in the remaining Class A S.I.G. patents. This transfer was a fulfilment of the obligation resting upon I.G. under the 1929 Four-Party Agreement. It was not in any sense an outgrowth of the war or the creation of a smoke screen. The validity of that transfer rests upon the same principles as did the validity of the transfer of the 200 shares of S.I.G. stock.

The second reservation is that I.G. had the bona fide intent to make a final and binding transfer to Mr. Currie, as trustee, for the benefit of the Jersey group of part of the equitable interest in the Lauryl Amine and other AD patents exactly equal in scope to the Jersey group's partial equitable interest in Class B S.I.G. patents. The validity of that transfer also rests upon the same principles as did the validity of the transfer of the 200 shares of S.I.G. stock.

The third reservation relates to the 5 shares of Jasco stock acquired by the Jersey group from I.G.'s New York representative, Dr. Duisberg. In order to acquire that stock the Jersey group had to use $4,000 of its money to secure the release from Dr. Duisberg of his claim to that stock. That is, the Jersey group as an agent for I.G. advanced money to make a purchase and is entitled to an agent's lien. "An agent has a right to retain possession of money, goods, or documents of the principal, of which he gained possession in the proper execution of his agency, until he is paid the amount due him from the principal as compensation for services performed or as indemnity for money advanced or liability incurred by him in connection with such things." Am.L.Inst.Restatement of Agency § 464 (a), Restatement of Security § 61 (g); Harris v. Woodruff, 124 Mass. 205, 26 Am.Rep. 658; Gill v. Hornblower, 294 Mass. 26, 30, 200 N.E. 376. Such a validly acquired lien is effective against the United States and the Custodian. Trading with the Enemy Act, § 8, 40 Stat. 411, 418, 50 U.S.C.A.Appendix, § 8; Mayer v. Garvan, D.C.D.Mass., 270 F. 229, 239.

The reservation stated in the last three paragraphs show that on March 25, 1942, the Jersey group and not I.G. was the holder of the legal title of and an equitable servitude (of the scope defined in the Four-Party Agreement) upon all Class A S.I.G. patents, the holder of an equitable servitude (of a scope analogous to that set forth in the Four-Party Agreement for Class B S.I.G. patents) upon Lauryl Amine and other AD patents, and the holder of a lien of $4,000 upon the 5 shares of Jasco stock.

Since those rights were not in I.G., they were not vested in the Custodian by his Vesting Order No. 1. They were however, seized by the Custodian on May 24, 1944. That seizure was not authorized by the Trading with the Enemy Act and gives rise to a valid claim by plaintiffs.

## XI.

In the preceding parts of this opinion it has been shown that by Vesting Order No. 1 served March 25, 1942, at 2:15 P.M. the Custodian acquired the following interests of I.G.—a partial equitable interest in or servitude (of the scope defined in the Four-Party Agreement) upon the Class A S.I.G. patents, the legal title to and a partial equitable interest in or servitude (of the scope defined in the Four-Party Agreement) upon the Class B S.I.G. patents and the AD patents including the Lauryl Amine patent, the legal title to and a partial equitable interest in or servitude (of the scope defined in the Oppanol Memorandum) upon the Oppanol patents, the legal title to and the full equitable interest in all the other Jasco patents, the 5 shares of Jasco stock subject to a $4,000 lien in favor of the Jersey group and 170 shares of USAC stock. The Custodian had those interests when he became a party to the anti-trust suit in the New Jersey District Court and when he assented to the Consent Decree.

The issue which must now be considered is what effect did the Consent Decree have upon those legal titles and equitable interests of the Custodian.

The decree was entered in an anti-trust suit brought against the present plaintiffs but not against I.G. The decree sought to accomplish two objectives: First, to sever all relations within the jurisdiction of the New Jersey District Court between the Jersey group and I.G.; second, to impose compulsory licensing upon United States patents which the Jersey group and I.G. had used in restraint of trade. To accomplish those objectives, and particularly the first one, the decree, among other provisions, ordered the present plaintiffs to refrain from the further performance of their unlawful agreements with I.G. [Art. III], to discontinue all existing relations with I.G. [Art. IV], to transfer to named corporations all the present plaintiffs' interests in Class A and Class B S.I.G. patents and Jasco patents [Art. IV], and to cease accounting to I.G. [Art. V (3)]. Article VII of the Decree guarantees that nothing in the decree shall "affect or diminish" the present plaintiffs' interests in patents, licenses or shares of stock. The Custodian in Article XII became a party to the decree on the terms first, that he should execute such transfers of property as might be necessary to carry out the decree, and second, that his consent should not affect his further rights to property unaffected by the decree.

Plaintiffs in effect contend that this decree is an adjudication that they are the holders of the legal title to and at least part of the equitable interest in the Class A and Class B S.I.G. patents, the Lauryl Amine patent, and the Jasco patents; that the legal and equitable interests in those patents which I.G. had and to which the Custodian succeeded by his Vesting Order No. 1 are eliminated; and that the present plaintiffs' obligations, if any, with respect to shares of USAC stock and shares of Jasco stock are eliminated. Those contentions are unsound.

Examined microscopically the decree has a quite limited effect upon the interests now in litigation.

The decree has obviously no impact upon the 200 shares of S.I.G. stock.

The decree has obviously no impact upon the 255 shares of USAC stock as to which the Jersey group had both the complete legal title and the full equitable interest. The decree, though less obviously, also has no impact upon the 170 shares of USAC stock as to which by his Vesting Order No. 1 the Custodian acquired the full equitable interest and the right to call for the complete legal title. The Custodian's rights to this stock were not in name covered by the decree. Moreover, having the full equitable interest in those 170 shares, the Custodian has, by virtue of the Trading with the Enemy Act as interpreted in Stoehr v. Wallace, 255 U.S. 239, 246 (first full paragraph), 41 S.Ct. 293, 65 L.Ed. 604, and apart from any contractual obligation, the right to have transferred to him the complete legal title. He does not have to call upon the Jersey group or any of its officers to violate Article III and similar provisions of the decree which restrain them from performing any agreement with I.G.

The decree has no impact upon the Jersey Group's lien of $4,000 upon the 5 shares of Jasco stock or the Custodian's

right, subject to that lien, to the full equitable interest in and the right to demand legal title to those 5 shares. The decree does not mention the stock. The decree does not affect the Jersey group's $4,000 lien, for, though the decree in Article III restrains the Jersey group from performing agreements with I.G. and in Article IV (1) requires the Jersey group to discontinue existing relations with I.G., the decree was not designed to affect adversely the Jersey group's lien interest in any stock. This is made abundantly clear by Article VII which stipulates that "Nothing contained in this decree shall affect or diminish any right, title or interest of the defendants [i.e. the Jersey group] * * * in or to or under * * * shares of corporate stock." Moreover, neither I.G. nor the Custodian would violate the decree by paying the Jersey group $4,000 inasmuch as I.G. was not a party to the New Jersey case, and Articles III, IV, V, XII and the like do not purport to enjoin the Custodian from performing agreements I.G. made with the Jersey group. Nor does the decree affect the Custodian's rights in the Jasco stock subject to that lien. He acquired his equitable interest in the 5 shares of stock by seizure before the decree was entered. Having that equitable interest he could, as soon as he paid off the $4,000 lien, and solely by virtue of the doctrine of Stoehr v. Wallace, supra, without reference to any agreement or relation or accounting between the Jersey group and I.G., acquire the legal title to those shares and have them registered in his name.

■■■ The decree both in name and in substance does affect the Class A S.I.G. patents, although, contrary to the Jersey group's contention, the decree does not "adjudicate" the complete status of those and other patents. Prior to the decree the Jersey group had the complete legal title to those patents and it had a large part of the equitable interest therein, but the Custodian had, by derivation from I.G., equitable interests such as royalty rights and licensing rights founded upon Article II A of the Four-Party Agreement. The decree, as the caveat in Article VII thereof underlines, did not diminish the Jersey group's legal title to the Class A patents. It did, however, subject that group's equitable interests to certain restrictions: that is, Article IV (2) ordered the Jersey group to transfer all "their" equitable interests in Class A S.I.G. patents

to S.I.G. so that S.I.G. could issue licenses, unrestricted as to use or field, to all applicants, royalty-free for the duration of the war emergency and subject thereafter to a reasonable royalty set by the Attorney General with the approval of the New Jersey District Court. Moreover, the decree affected the Custodian's equitable interests such as royalty rights and licensing rights. Those interests sprang out of agreements made by the Jersey group with I.G. To put the matter another way, the Custodian was the assignee, by operation of his Vesting Order, of the rights of I.G. against the Jersey group under the Four-Party Agreement. Article III of the decree enjoined the Jersey group from performing their agreement, Article IV (1) ordered the Jersey group to discontinue existing relations with I.G., and Article V (3) restrained the Jersey group from accounting to I.G. Thus at least the first of these restraints impaired the right of the Custodian to have the Jersey group give him licenses and royalties. Perhaps the second and third restraints were inapplicable to the Custodian since licenses and royalties given to him would not have involved either "relations with I.G." or "accounting to I.G." But that question is academic, because in Article XII of the decree the Custodian agreed "to execute such further transfers of property to S.I.G. * * * as may be necessary to carry out the provisions of the decree, including the provisions of the decree limiting or prohibiting royalties under those [Sic. The word 'those' has no clear antecedent.] patents and providing for compulsory licensing under them." Thus by Article XII, as well as by Article III, the royalty and licensing rights of the Custodian were virtually destroyed with the consent of the Custodian himself. That consent was entirely valid on two grounds. One is that § 5 (b) of the Trading with the Enemy Act, as amended, Act of December 18, 1941, c. 593, 55 Stat. 838, 839, 50 U.S.C.A.Appendix, § 5(b), gives the Custodian power to consent; the other is that the Custodian was acting in cooperation with the Attorney General and they together had the power to consent. Compare People of State of New York v. New Jersey, 256 U.S. 296, 308, 41 S.Ct. 492, 65 L.Ed. 937. From what has been said it follows that after the Consent Decree plaintiffs had the complete legal title to and full equitable interest in the Class A S.I.G. patents, subject, however, to pro-

visions, such as Article IV, of the Consent Decree, but freed from the former equitable interests of the Custodian.

The decree also has some effect upon the Class B S.I.G. patents, the Lauryl Amine and other AD patents, and the Oppanol patents. Prior to the decree, the Jersey group had equitable interests in the licensing and royalty rights in those patents in accordance with Article II B of the Four-Party Agreement, the communication submitting the Lauryl Amine patent to Mr. Currie as trustee and the Oppanol Memorandum; and the Custodian, by derivation from I.G., had the rest of the equitable interest and the complete legal title. The Jersey group was required by the decree to transfer to S.I.G. or Jasco not only "their" interest in these patents [Article IV (2) and (3) but "the title * * * to all patents originating with I.G. to which Jersey or any of its * * * agents holds title or the right to transfer title [Article IV (4)]. The effect of those and other provisions of the decree upon the limited equitable interests of the Jersey group in the Class B S.I.G., AD and Oppanol patents was to submit those equitable interests to the provisions, particularly of Article IV, of the decree which required the granting of indiscriminate licenses without charge during the war and upon a reasonable charge thereafter. The impact of those and other provisions of the decree, particularly Article XII, upon the Custodian's interests was more complicated. The Custodian's legal title was unaffected for these reasons: so far as the United States and the Custodian were concerned the legal title to those patents had never been effectively transferred from I.G. to the Jersey group; the Custodian had vested in himself I.G.'s legal title to those patents before the decree was entered; the decree did not purport to touch any title which at the time of the decree was not one of "their" (i.e. the Jersey group's) titles or one of the titles which Jersey or its agents held or had a right to hold (Article IV (2) (3) (4); as Article VII of the decree states, the decree did not purport to "affect," that is increase or decrease, the Jersey group's title to any patent; and the Custodian's promises in Article XII did not embrace any promise to transfer legal title to any patent. The effect of the decree and particularly Article XII upon the Custodian's equitable interest needs elaboration. The Custodian in that article agreed "to execute

such further transfers of property as may be necessary to carry out the provisions of the decree, including the provisions of the decree limiting or prohibiting royalties under those (sic) patents and providing for compulsory licensing under them." The decree does not define what it means by "transfers of property," and it therefore left it open to the Custodian to transfer only such legal or equitable interests as were absolutely necessary to carry out the decree. The Custodian fully performs the obligation resting upon him if, without conveying legal title, he makes such transfers to S.I.G. and Jasco as are necessary to give them first, the right to license others under Class B S.I.G., Lauryl Amine, other AD and Oppanol patents free of royalty during the war and subject to reasonable royalty thereafter, and second, the right to keep for themselves (and not to hand over to the Custodian as assignee of I.G.) any share in the royalties which in agreements adjudged to be unlawful Jersey promised to pay I.G. This partial elimination of the Custodian's equitable interest in Class B S.I.G., Lauryl Amine, other AD and Oppanol patents rests on principles discussed above in connection with Class A S.I.G. patents. This elimination, however, does not apply to the Custodian's rights to royalties received by the Jersey group from the use of Oppanol processes outside the scope of the Oppanol Memorandum or the use of Class B. S.I.G., Lauryl Amine or other AD patents outside the scope of the license given by the Four-Party Agreement. In all these outside uses the governing principles are those discussed below in connection with the bulk of the Jasco patents. The reason is that in those outside fields the Custodian's right to royalties rests not on a claim under an unlawful agreement, memorandum or license, but on equitable ownership which was originally in I.G. and after Vesting Order No. 1 in the Custodian, but never in the Jersey group.

The impact of the decree upon Jasco patents other than Oppanol remains to be considered. Prior to the decree the Jersey group was not entitled with respect to those patents either to the legal title or the equitable interest, but the Custodian had, by derivation from I.G., the full equitable interest and the right to the complete legal title. I.G.'s attempt to give Jasco the legal title had been ineffective against the United States and the Custodian. And having the

full equitable title, the Custodian, by virtue of the doctrine of Stoehr v. Wallace, supra, and apart from any agreement or relationship or accounting to which I.G. was or had been a party, was entitled to register himself at once as the holder of the legal title. The Consent Decree did not affect the Custodian's legal title to these Jasco patents any more than it did his legal title to the Class B S.I.G. patents, the AD patents and the Oppanol patents. Nor did it substantially affect his equitable interests. The Custodian's equitable interest in the royalties from the use of the bulk of the Jasco patents does not rest on any agreement, lawful or unlawful, between I.G. and the Jersey group. His right to those royalties rests exclusively on the fact that the equitable interest in these patents originally belonged to I.G. and later belonged to the Custodian by seizure on March 25, 1942, without ever having belonged to the Jersey group. Therefore, the Consent Decree does not alter the Custodian's right to royalties during the postwar period for the bulk of the Jasco patents. To be sure, under Article XII of the decree, the Custodian was bound to and did transfer to Jasco the bare function of issuing licenses to applicants royalty free during the war and upon reasonable terms thereafter, but he was not required to and never did transfer to Jasco the legal title to the Jasco patents or any right to share in the income therefrom. No one has so far suggested that by Vesting Order No. 1 (which was indeed prior to the decree) or by Supplemental Order No. 1 to Vesting Order No. 1 that the Custodian has sought to disturb Jasco in the limited licensing function given to it by the decree and by his transfer. Jasco, seemingly, still enjoys it. And the complaint in this action perhaps does not seek to recover on Jasco's behalf a bare licensing right which does not appear to have been taken from Jasco. However, if that bare right has been disturbed, Jasco is entitled to recover it. Thus the only impact of the Consent Decree upon these Jasco patents in the present litigation is to give Jasco a licensing right which the Custodian, if he seized that right, must return.

To summarize this part of the opinion, the only relevant impact of the Consent Decree was to eliminate the Custodian's equitable interest in the Class A S.I.G. patents, to subject to the licensing and royalty provisions of the Consent Decree plaintiffs' and the Custodian's equit-

able interests in the Class B S.I.G. patents, the Lauryl Amine and other AD patents and the Oppanol patents, and to give Jasco a bare licensing right in other Jasco patents.

## XII.

Preceding parts of this opinion show that under the Trading with the Enemy Act the Custodian had no right to seize (or, more accurately, no right to regard as enemy property—for the seizure itself was authorized, subject to the risk of return), the following interests—the legal title to or any equitable interest in the Class A S.I.G. patents, or the partial equitable interest in or servitude (of the scope defined in the Four-Party Agreement as limited by the Consent Decree) upon the Class B S.I.G. patents, the Lauryl Amine patent, and the other AD patents, or the equitable interest in or servitude (of the scope defined in the Oppanol Memorandum as limited by the Consent Decree) upon the Oppanol patents, or the legal title to and the equitable interest in 200 shares of S.I.G. stock and 255 shares of USAC stock or the lien of $4,000 upon 5 shares of Jasco stock.

Since those seizures were unwarranted plaintiffs have a right to recover under § 9 of the Trading with the Enemy Act. The right is statutory, but the basic principle underlying the right of a citizen or domestic corporation to recover from a government that takes his or its property under the mistaken belief that it belongs to the enemy has almost as long a history as the government's own right of seizure.

The government's right to seize property supposed to belong to an enemy grew historically from the thirteenth century "inquisition of office". Sir Arnold D. McNair, Legal Effects of War (2nd Ed., 1944) p. 125. "An office found is the verdict of an inquest taken ex officio by a royal officer for the ascertainment of the King's rights." F. W. Maitland quoted in Holdsworth, History of English Law, vol. IX, p. 24 note 2. And that practice of a royal inquisition of office had not been long established before the English subject whose property had been wrongfully taken had not the mere permission as a matter of royal grace to file a petition of right for its recovery, but the absolute legal right by a plea known as "monstrans de droit" to traverse the office found and to show that no enemy but he the citizen was the owner of

the property. Holdsworth, supra, Vol. IX, p. 24 et seq., vol. X, p. 343. That ancient plea of "monstrans de droit" is the legal ancestor of § 9 of the Trading with the Enemy Act here involved. And it is in the spirit of the plea of "monstrans de droit" that the claims with respect to interests seized by the Custodian on May 25, 1944 must be considered.

There remain to be answered some suggestions made at the bar.

None of these claims should be denied by this Court on the ground that it sounds in contract or is an assertion of a mere executory interest. All of the claims are claims to what lawyers call "property"— even the royalty, licensing and like interests in patents are classified within that rare genus of property denominated "equitable servitudes." To be sure, those royalty, licensing and like interests have not only that property aspect, but also a contractual aspect. But the same may be said of shares of corporate stock. And no one doubts that such shares are recoverable from the Custodian. Henkels v. Sutherland, 271 U.S. 298, at page 299, lines 29–31, 46 S.Ct. 524, 70 L.Ed. 953; Metz v. Garvin, D.C.S.D.N.Y., 3 F.2d 182. See Sir Arnold D. McNair, Legal Effects of War, 2d Ed. 1944, p. 222.

■ Furthermore, as determined in the course of the trial of this case, none of these claims should be denied on the ground that the patents, the servitudes upon them, the shares of stock or the liens upon them were acquired by plaintiffs in violation of the anti-trust laws. Standard Oil Co. (New Jersey) et al. v. Markham, D.C.S.D.N.Y., 61 F.Supp. 813. As Lord Justice du Parcq said in Bowmakers Ld. v. Barnet Instruments Ld., C.A.1944, [1945] 1 K.B. 65, at page 71: "In our opinion, a man's right to possess his own chattels will as a general rule be enforced against one who, without any claim of right, is detaining them, or has converted them to his own use, even though it may appear either from the pleadings, or in the course of the trial, that the chattels in question came into the defendant's possession by reason of an illegal contract between himself and the plaintiff, provided that the plaintiff does not seek, and is not forced, either to found his claim on the illegal contract or to plead its illegality in order to support his claim."

Nor should the claims be denied on the contention that to enforce plaintiffs' equitable servitudes upon the Class B S.I.G., Lauryl Amine, Ad and Oppanol patents will be to enforce executory agreements unlawful under the anti-trust laws. To that contention these are the answers: plaintiffs' servitudes no longer depend on the original agreements with I.G. but on the transfers required to be made by the Jersey group pursuant to Article IV of the Consent Decree and on the transfers agreed to be made by the Custodian pursuant to Article XII; the exercise of those servitudes cannot be supposed to involve any conduct unlawful under the anti-trust laws since the New Jersey District Court, which dealt comprehensively with the effect of the anti-trust laws on those servitudes, directed that the servitudes should be performed and has retained continuing control of their performance; indeed the Consent Decree is in effect an adjudication of the validity of the equitable servitudes, and an adjudication binding on the Custodian as well as other parties to the decree; and the enforcement of the servitudes now will not involve I.G. or any other corporation known to be presently engaged in an unlawful conspiracy, but will involve only governmental officers like the Attorney General and the Custodian and corporations like S.I.G. and Jasco which are acting under a strict visitorial regime.

Recovery by plaintiffs should therefore be allowed as to everything the Custodian seized by his Supplement No. 1 to Vesting Order No. 1, served May 24, 1944.

### XIII.

Stated summarily, this decision gives to Standard Oil Company or others in the Jersey group everything which they had prior to Germany's attack upon Poland in 1939: that is, the legal title to and equitable interest in the patents in the Hydrocarbon Field (sometimes called the Class A patents) and some of the equitable interest in licensing, royalty and other rights in patents useful in the Hydrocarbon Field (sometimes called the Class B patents)— for all of which the Jersey group paid to I.G. in 1929 stock and cash together amounting to over $35,000,000. Those patents and patent rights, however, remain subject to the terms of the Consent Decree entered in 1942 by the United States District Court for the District of New Jersey. The decision of this Court also gives to the Jersey group 255 shares of USAC stock for which Development in 1938 paid $22,-

500; and 200 shares of S.I.G. stock which Standard in September 1939 bought outright from I.G. for full value, that is, for $20,000, as a result of a transaction that originated before the Hague Conference. The decision further gives to the Jersey group limited equitable rights, likewise subject to the Consent Decree, in the Lauryl Amine patent, other AD patents and the Oppanol patents and a lien of $4,000 on 5 shares of Jasco stock.

However, the decision denies plaintiffs' claims to, and allows the Custodian to keep, the legal title to and, subject to the Consent Decree, a limited equitable interest in patents useful in the Hydrocarbon Field (sometimes called Class B patents), the Lauryl Amine patent, other AD patents and the Oppanol Patents; both the legal title to and, subject to the Consent Decree, the full equitable interest in the Jasco patents for all types of the Buna, Acetylene Arc and Paraffin Oxidation processes; the legal title to and the full equitable interest in 170 shares of USAC stock; and, subject to a $4,000 lien, 5 shares of Jasco stock. These properties which the Custodian is allowed to retain were, in general, the properties which the Jersey group acquired at or after the September 1939 conference held at the Hague, immediately following the outbreak of World War II. That was the conference which, as the findings of fact state in detail, resulted in transactions which were not, as the saying goes, "firm contracts" or "firm sales." The true nature of the agreement made at the Hague conference is revealed by the fact that though it involved important transfers from I.G. to the Jersey group, the Jersey group never gave in return any stock or any cash, aside from the $4,000 loan which was and is fully secured by a legal lien. And the only other things of value which the Jersey group purported to surrender at the Hague were, first, the equitable right to ½ the Oppanol royalties arising from the oil industry outside of Germany and, second, the bare hope of some day receiving ⅔ of the non-German royalties in such other Jasco processes as I.G. might at an indefinite future date convey to Jasco by as yet unnegotiated specific agreements. In short, the Hague agreement and the subsequent transactions in reality, though not always in form, left I.G. with unaltered legal and equitable rights in the properties referred to in this paragraph. And so the United States Government and the Alien Property Custodian were entitled to seize those rights on March 25, 1942 as properties of an enemy.

Nothing herein intimates any opinion as to which party to this case has won the more important points. The Court has no means of estimating the present value of the properties to be distributed by its decree, and has no view as to what moral weight, it any, the parties attach to the vindication or lack of vindication of the positions they have taken upon the issues raised in this case.

Decree of "ouster le main" to be entered in accordance with opinion, findings of fact and conclusions of law.